IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | | |
|---|---|---|
| Denny Hecker's Cadillac – Pontiac – GMC, Inc.; Walden Fleet Group, Inc., and Southview Chevrolet, Co., and | ) ) ) | Court File No. 10-cv-00068-JRT-RLE |
| Plaintiffs, | ) ) ) | |
| Vs. | ) ) | |
| GMAC Inc., formerly doing Business as GMAC, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## TRANSMITTAL AFFIDAVIT OF WILLIAM R. SKOLNICK

| | | |
|---|---|---|
| STATE OF MINNESOTA | ) | |
| | ) | SS. |
| COUNTY OF HENNEPIN | ) | |

William R. Skolnick hereby deposes as follows:

1.      That I am one of the attorneys of record for Plaintiffs' Denny Hecker's Cadillac –

Pontiac – GMC, Inc., Walden Fleet Group, Inc., and Southview Chevrolet, Co and am providing

this Affidavit concurrently with Plaintiffs' Memorandum of Law in Opposition to Defendant's

Motions for Dismissal. The facts contained herein are based on my personal knowledge.

2.      That attached hereto are true and accurate reproductions of the following

referenced Exhibits in Plaintiffs' Memorandum:

| | |
|---|---|
| Exhibit A | Complaint and Jury Demand dated January 7, 2010 With attachments - Forbearance Agreement (Ex. A) And Voluntary Surrender of Collateral Agreement (Ex. B) |

| Exhibit B | News Release from Minnesota Department of Public Safety re:  State Patrol Investigation of Hecker Automotive Group dated June 17, 2009 |
| Exhibit C | StarTribune.com article dated June 17, 2009 re: criminal probe targets Hecker car business |
| Exhibit D | Automotive News article dated June 17, 2009 re: Police raid Hecker homes & businesses |
| Exhibit E | Minnesota Public Radio article dated June 17, 2009 re: State Patrol launches criminal probe of Hecker Automotive |
| Exhibit F | StarTribune.com article dated June 18, 2009 re:  Authorities raid Hecker offices, homes |
| Exhibit G | KSTP Eyewitness News article dated July 30, 2009 re: FBI raids Hecker headquarters |
| Exhibit H | Minneapolis St. Paul Business Journal dated July 30, 2009 re: Report: FBI searching Hecker's HQ |
| Exhibit I | StarTribune.com article dated July 30, 2009 re:  Feds again raid Hecker's HQ |
| Exhibit J | StarTribune.com article dated July 30, 2009 re:  Report: more search warrants target Hecker HQ |
| Exhibit K | Indictment against Dennis Hecker and Steven Leach dated February 10, 2010 |

FURTHER YOUR AFFIANT SAITH NOT.

William R. Skolnick

Sworn and subscribed to before me
A Notary Public this 10 day of
March, 2010.

[Notary Public]

ZACHARY MEYER PUCHTEL
Notary Public-Minnesota
My Commission Expires Jan 31, 2014



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| Denny Hecker's Cadillac – Pontiac – GMC, Inc.; Walden Fleet Group, Inc., and Southview Chevrolet, Co., and<br><br>Plaintiffs,<br><br>Vs.<br><br>GMAC Inc., formerly doing Business as GMAC, LLC,<br><br>Defendant. | ) ) ) Court File No. _____<br> ) ) ) ) **COMPLAINT** ) **AND JURY DEMAND** ) ) ) ) ) |

Plaintiffs above named for their Complaint against GMAC Inc., formerly doing business as GMAC LLC ("GMAC"), state and allege as follows:

### INTRODUCTION

Defendant GMAC provided primary financing of vehicle inventory for the Plaintiffs owned car dealerships. In late 2008 and early 2009, Defendant, GMAC, marched in with their representatives and took total day to day control of the Plaintiffs' dealership and assets, such as money on hand, receivables, and retained complete control of all monies obtained from automobile sales transactions. GMAC failed to use these monies specifically collected from consumers for the purpose of paying taxes, title, license, lien payoffs, warranties and other miscellaneous items. Instead, GMAC put this money in its own pocket claiming to apply these monies against the debt it believed it was owed by Plaintiffs. Defendant GMAC knew these monies belonged to the State of

1



EXHIBIT
A

Minnesota and other third parties, yet put its own business interests and concerns ahead of its legal obligations.

There were at least three other streams of money captured or frozen that Plaintiffs attempted to pursue for payment of monies owed to the State of Minnesota and other third parties, separate from the monies wrongfully held by GMAC.   These sources of monies included:

A      The dealership cash savings account GMAC held for Plaintiffs, which had a balance of approximately $600,000.00.

B      Defendant GMAC's business partner General Motors ("GM"), refused to approve the fully negotiated sales of Plaintiff's dealerships to Luther Automotive and/or Walser Automotive Group.  The net proceeds of these sales would have paid GMAC in full, paid the legally required payments, and left excess funds to pay unsecured creditors and employees.

C      GM offered the Plaintiffs in excess of $1.5 million dollars to close the dealerships and as part of "wind down" compensation agreements for the three dealerships, that was accepted by Plaintiffs.  GMAC directed these funds to its own accounts.

Defendant GMAC put all of the above sums in its own pocket claiming to apply them  towards the debt of Plaintiffs.  Defendant GMAC knowingly withheld monies it came to possess belonging to the State of Minnesota and other third parties, despite repeated demands from Plaintiffs that it either pay these monies directly or make them available to Plaintiffs to do so.  GMAC made it impossible for Plaintiffs to independently pay these amounts from the various sources of income identified above.

2

## THE PARTIES

1.      Plaintiff Denny Hecker's Cadillac – Pontiac – GMC, Inc. ("Stillwater Cadillac") is a Minnesota corporation, whose prior principal place of business was located in Washington County, Minnesota.  Plaintiff Stillwater Cadillac owned an automobile dealership.

2.      Plaintiff Walden Fleet Group, Inc. ("Walden Fleet") is a Minnesota corporation, whose prior principal place of business was located in Pine County, Minnesota.  Plaintiff Walden Fleet also primarily engaged in the automobile dealership business.

3.      Plaintiff Southview Chevrolet Co. ("Southview Chevrolet") is a Minnesota corporation, whose prior principal place of business was in Dakota County, Minnesota.  Plaintiff Southview was primarily engaged in the automobile dealership business.

4.      Defendant GMAC, Inc. ("GMAC") is the successor to GMAC, LLC, a Delaware limited liability company with its principal place of business in the State of Michigan that primarily engaged in the business of providing financing to automobile dealerships. Automobile manufacturer GM owned approximately 50% of the membership interests in GMAC LLC during the relevant time period.  As of June 30, 2009, GMAC LLC converted to a corporation under the laws of the State of Delaware and is now known as GMAC Inc.  GMAC Inc. is a continuation of the business of GMAC LLC.[1]

---

[1] GMAC LLC was the incorporator of GMAC Inc. on June 30, 2009 and listed its Detroit, Michigan address in the duly filed document with the Delaware Secretary of State, which continues to be the principal place of business for GMAC Inc, thereby evidencing the continuation of business of GMAC LLC through GMAC Inc.

## JURISDICTION / VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 based on diversity of citizenship between the parties together with the fact that the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

6.      Venue is proper in this District Court under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this action occurred within this District and State. The contractual agreements between the parties were negotiated and executed in Minnesota and the parties conducted business within the State of Minnesota. GMAC LLC had ongoing communications with Plaintiffs in Minnesota, as well as a physical presence at Plaintiffs' dealerships.

## FACTS COMMON TO ALL COUNTS

7.      Defendant GMAC through its predecessor entity GMAC LLC provided the primary financing to Plaintiffs' automobile dealerships for numerous years.

8.      During late 2008, GMAC presented Plaintiffs with a document captioned "Forbearance Agreement" in order to address the short-term financial needs of Plaintiffs. The Forbearance Agreement was effective November 18, 2008 and allowed for a forbearance period through December 8, 2008. Attached hereto and marked as Exhibit A is a true and accurate reproduction of the Forbearance Agreement.

9.      Referenced in the Forbearance Agreement is a Voluntary Surrender Agreement[2], which was to be simultaneously executed and which was to become effective upon a default. Attached hereto and marked as Exhibit B is a true and accurate

---

[2] Both the Forbearance Agreement and the referenced Voluntary Surrender Agreement are governed by the laws of the State of Minnesota.

reproduction of the Voluntary Surrender Agreement.   The Voluntary Surrender Agreement contains the following express language:

> GMAC will apply the proceeds of the disposition and sale of the Collateral to the payment of the Indebtedness, and any other sums due or to become due under the Loan Documents, including attorneys' fees and expenses incurred in retaking possession of, transporting, storing, preparing for sale, and disposing of and selling the Collateral, in such order and manner as GMAC determines in its sole discretion, **unless otherwise directed by law**. [emphasis added]

10.     In late 2008, because of the precipitous decline in the American economy resulting in an approximate 40% decline nationally in automobile sales and other events beyond Plaintiff's control, Plaintiffs were unable to sell automobiles they purchased from General Motors through GMAC.

11.     In addition, GM had provided in the past significant "dealer incentive" cash payments made to automobile dealers upon the sale of new automobiles, in order to encourage the purchase of new automobiles. These payments were received by Plaintiffs from GM within 30 days.  However, in late 2008 / early 2009, GM announced that it was unilaterally delaying payment of these "dealer incentives" to automobile dealers such as Plaintiffs. As a result, Plaintiffs had severe cash liquidity issues.

12.     Despite the fact that GMAC had a first security interest in all of Plaintiffs' assets, including the new vehicles for sale and the "dealer incentives" GM provided, GMAC refused to allow Plaintiffs to sell any vehicles unless the full amount owed for financing that particular vehicle was paid, regardless of whether the automobile was sold and was waiting for the incentives of up to $10,000 per vehicle. In addition, when the GM incentive did arrive, GMAC refused to apply the incentive money to previously sold vehicles.

13.     Historically, Plaintiffs had on deposit with GMAC in excess of $300,000 of Plaintiffs' own money in an interest bearing cash management account, which had no restrictions. In early 2009, required that Plaintiffs post a total of $600,000 in this cash management account with GMAC. Plaintiffs paid these monies, and GMAC subsequently froze Plaintiffs' use of all of these monies, which had a material adverse impact on the cash flow of the dealerships.

14.     During late 2008 and early 2009, GMAC took possession and control of the keys and title documentation to all of Plaintiffs' automobiles GMAC had financed. If Plaintiffs sold any of those automobiles, GMAC would not allow the title documentation to be transferred unless all proceeds from the sale, including amounts for taxes, licensing fees and (if applicable) lien payoffs on trade in vehicles were paid directly to GMAC at the time of closing on the sale. GMAC retained control of the all the proceeds and documentation for the transactions.

15.     In 2009, Plaintiffs learned that GMAC was not paying to the State of Minnesota the amount GMAC received on the automobile sales for tax, license and title fees. As a result, Plaintiffs requested that GMAC provide an accounting for the amount it received on such sales and to promptly pay the amounts due for taxes or fees owed to the State of Minnesota or to lien holders. GMAC refused to provide such an accounting for all sales.

16.     GMAC released a token portion of all monies held but then continued to take the position that it was not liable for the payment of lien payoffs or other third parties, or any additional monies for taxes, title and licensing fees.

6

17.     In addition, Plaintiffs requested that GMAC use the cash management account to pay the State of Minnesota and the lien payoffs, which GMAC refused to do.

18.     During June 2009, GM filed for bankruptcy protection. Under its Chapter 11 Plan, GM terminated many dealerships and offered those dealerships monies pursuant to "wind down" agreements. Plaintiffs were offered such "wind down" agreements and accepted the offers from GM.

19.     Pursuant to GMAC's lending agreements with Plaintiffs, GMAC would receive those monies from GM to the extent GMAC had loans outstanding to the Plaintiffs. GMAC failed to provide Plaintiffs any accounting for how these monies were applied and when they were received.

20.     On June 17, 2009, law enforcement officials from the State of Minnesota executed search warrants on Plaintiffs' properties seeking information on why tax, title and license fees as well as lien payoffs had not been made in conjunction with automobile sales Plaintiffs made, but on which GMAC received all the proceeds from those sales.

21.     Despite repeated demands by Plaintiffs that GMAC voluntarily turn back in their entirety those monies that were never legally those of Plaintiffs for GMAC to attach or apply towards the outstanding debts of Plaintiffs, GMAC continued to refuse to either provide any additional monies or provide a meaningful detailed accounting. Instead, GMAC has been allowed to prefer itself over the State of Minnesota and other third parties who were the intended, designated recipients of monies from the automobile sales at Plaintiffs' dealerships that were controlled entirely by GMAC.

## COUNT I – CONVERSION / MISAPPROPRIATION OF MONIES

22.     Plaintiffs restate and reallege all prior paragraphs herein.

23.     As set forth above, GMAC through the exercise of its control over Plaintiffs' day to day business operations and the transactions involving the sale of automobiles sitting on Plaintiffs' respective dealership locations that GMAC financed, directly possessed and controlled to the exclusion of Plaintiffs the following escrowed, or entrusted, funds paid by third parties for the intended payment to the following: a) taxes, title and license fees, which were all due to the State of Minnesota;  b) lien payoffs on trade in vehicles that were clearly intended to payoff third party lien holders so that consumers did not end up with unsatisfied debts and their credit destroyed; and  c) various warranty programs that were offered concurrently with the sale of automobiles.

24.     GMAC clearly knew, or should have known, that as a matter of law it was required pursuant to Minn. Stat. §297B.10(b) to make certain these monies were turned over promptly to the State of Minnesota and other third parties.

25.     Plaintiffs made numerous ongoing attempts to have GMAC either directly pay to the State and various third parties these entrusted monies from the closings or, alternatively, to make them available for Plaintiffs to pay them over. GMAC outright refused to do so.

26.     Plaintiffs never authorized GMAC or any of its authorized agents or successors in interest to wrongfully retain and apply towards Plaintiffs' indebtedness these designated and entrusted monies for payment to the State of Minnesota and other third parties.  As stated in the Voluntary Surrender Agreement, the disposition of

Collateral was never supposed to encompass monies that belonged to other third parties if otherwise "directed under law."

27.    GMAC admitted that it wrongfully retained monies belonging to the State of Minnesota and various third parties, as evidenced by its partial payment to Plaintiffs of a portion of these monies.

28.    GMAC without the authority or permission of Plaintiffs wrongfully applied all proceeds received from the sale of automobiles it financed without regard to the fact that certain designated monies belonged to the State of Minnesota and other third parties. It is believed that GMAC intended to permanently deprive Plaintiffs of their ability to obtain these monies and make certain they were properly forwarded to the State of Minnesota and others.

29.    Plaintiffs' independent reconstruction of its business records during the relevant period of time indicate that GMAC continues to wrongfully retain monies and that GMAC owes the State of Minnesota totaling approximately $34,000.00 related to completed sales for Plaintiff Southview Chevrolet and that GMAC owes an additional $202,000.00 for Plaintiff Stillwater Cadillac.

30.    There are additional amounts due and owing to various third parties for lien payoffs and warranty programs, for which GMAC is directly liable.

31.    In the alternative or in addition to other remedies, GMAC is directly liable to the State of Minnesota and others for the payment of the above specified amounts on behalf of the Plaintiffs, which it wrongfully converted.

### COUNT II – VIOLATION OF MINN. STAT. §297B.10 (b)/ BREACH OF CONTRACT

32.    Plaintiffs restate and reallege all prior paragraphs herein.

33.     Minn. Stat. §297B.10(b) provides that "any person" who "collects" taxes and other amounts due on the sale of an automobile must remit those amounts to the State. "Any person" under Minn. Stat. § 297B.10(b) includes Defendant GMAC.

34.     Plaintiffs are entitled to the benefits of the above Statute and to assert that as a matter of law, GMAC must remit immediately those amounts that remain due and owing to the State of Minnesota, as set forth more specifically herein.

35.     The Voluntary Surrender Agreement drafted by GMAC contains certain express protections for Plaintiffs, which prohibits offsetting amounts due to GMAC by Plaintiffs with monies belonging to third parties, as set forth above.

36.     Plaintiffs duly performed those obligations and conditions required by them under the Voluntary Surrender Agreement to the extent they were able.

37.     By failing and refusing to remit monies collected for taxes, license and title fees to the State of Minnesota, GMAC directly and materially breached its agreements with Plaintiffs. In particular, the Voluntary Surrender Agreements rather clearly mandates that monies required by law to be paid to third parties are NOT the property of Plaintiffs for purposes of GMAC exercising its rights under its agreements upon disposition of Collateral.

38.     As a direct and proximate result of GMAC's wrongful conduct, Plaintiffs incurred and continue to incur damages exceeding of $75,000 for which GMAC is directly liable.

## COUNT III – LENDER CONTROL LIABILITY

39.     Plaintiffs restate and reallege all prior paragraphs herein.

40.     Whenever a lender exercises control over the day to day activities of its borrower and concurrently engages in inequitable conduct, it is liable as a creditor in possession for its wrongful conduct in diverting monies for its own benefit that rightfully belong to others – in this case, the State of Minnesota and other third parties.

41.     Plaintiffs' owner, Hecker, is currently being investigated and pursued by the State of Minnesota for the outstanding taxes, title and license fees that GMAC failed to timely, or at all, voluntarily turnover to the State of Minnesota and other third parties for the financial transactions GMAC controlled to the exclusion of Plaintiffs.

42.     The wrongful retention of these monies by GMAC unjustly benefits GMAC at the expense of others including, but not limited to, Plaintiffs, the State of Minnesota and innocent third party consumers.

43.     In the alternative or in addition to other remedies, GMAC is directly liable to the State of Minnesota and others for the payment of the above specified amounts on behalf of the Plaintiffs, which total exceeds $75,000. GMAC's wrongful conduct in retaining third party funds that should have immediately been paid over to the State of Minnesota and others shortly after the completed sales transactions cannot be ignored.

### COUNT IV – BREACH OF FIDUCIARY DUTIES

44.     Plaintiffs restate and reallege all prior paragraphs herein.

45.     The typical lender / borrower relationship does not give rise to a fiduciary relationship. However, the following unique circumstances exist in this case that warrant Plaintiffs' ability to assert the existence of a fiduciary relationship and the breach of the same:   a) GMAC knowingly and willingly pursuant to the Voluntary Surrender Agreement agreed to directly handle any and all monies received in sales transactions, as

well as retain control over the finances of Plaintiffs; b) GMAC knowingly and

voluntarily agreed to the proper disposition of collateral and treatment of resultant funds,

as allowed by law[3], c) GMAC as the direct recipient of all monies obtained from

ongoing automobile transactions was entrusted with third party monies and, therefore,

owed a fiduciary duty to both Plaintiffs and the consumers to properly and legally handle

said entrusted monies; d) Plaintiffs reasonably relied upon GMAC to properly handle

monies obtained from automobile sales that belonged to either the State of Minnesota or

third parties; and e) Plaintiffs reasonably relied upon GMAC's superior experience and

knowledge in the proper handling of sales proceeds when controlling and operating a

dealership pursuant to its own agreements.

    46.    Plaintiffs' entered into the Voluntary Surrender Agreement and other loan

agreements with GMAC with the understanding that they could trust GMAC to properly

handle sales proceeds and make certain resultant taxes, title and license fees, as well as

monies received for lien payoffs and warranties were properly forwarded to the

appropriate intended recipients.

    47.    As set forth more specifically herein, GMAC violated its fiduciary duties

owing to Plaintiffs as they relate to the proper handling of sales proceeds it controlled and

dominated to the exclusion of Plaintiffs. GMAC further violated its fiduciary duties

owed to Plaintiffs by failing and refusing to provide the necessary accounting to ensure

these third parties were properly paid and that all sales proceeds were duly accounted for.

---

[3] As set forth in Count III, the wrongful retention of third party monies is a direct
violation of Minn. Stat. § 297B.10(b), which clearly applies to GMAC as the controlling
lender and direct recipient of said third party monies.

48.     As a direct and proximate result of GMAC's breaches of its fiduciary duties, Plaintiffs incurred and continues to incur damages in excess of $75,000.

## COUNT V – CONSTRUCTIVE TRUST

49.     Plaintiffs restate and reallege all prior paragraphs herein.

50.     In order for Plaintiffs to make certain the substantial amounts of monies wrongfully misappropriated and retained by GMAC are made available for payment to either the State of Minnesota or other third parties, Plaintiffs are entitled to the establishment of a constructive trust against any and all monies and other real and personal assets of GMAC in an amount equal to those claimed herein that are due and owing to the State of Minnesota and other third parties. This is especially important when GMAC has changed the legal entity under which it conducts business and cannot conduct its business without continuous financial bailouts by the U.S. government.

51.     Plaintiffs and other innocent third parties will be irreparably and substantially harmed if they are not provided with a constructive trust against funds and other assets presently in the possession and control of Defendant GMAC under the circumstances.

## COUNT VI – UNJUST ENRICHMENT

52.     Plaintiffs restate and reallege all prior paragraphs herein.

53.     GMAC preferred itself over the State of Minnesota, various third party lenders owed monies for payoffs, warranty program providers and consumers who unknowingly entered into sales transactions with Plaintiffs while GMAC controlled entirely the finances and operations relative to the sales. Moreover, GMAC failed and

refused to be accountable for monies it collected in excess of those actually due and owing by Plaintiffs to Defendant GMAC.

54.     It would be unjust and inequitable to allow GMAC to retain the substantial monies it continues to wrongfully retain when intended third party recipients (parties GMAC knew were entitled to these escrowed monies) remain unpaid.

## COUNT VII – DEMAND FOR AN ACCOUNTING

55.     Plaintiffs restate and reallege all prior paragraphs herein.

56.     Despite repeated requests to GMAC that it provide a complete accounting of all transactions it handled on behalf of Plaintiffs wherein it retained exclusive control and dominion over the monies and transaction documents, GMAC failed and refused to do so.  As a fiduciary entrusted with the finances and financial transactions involving third party monies, Plaintiffs are entitled to a complete and detailed accounting.

57.     Additionally, Plaintiffs are entitled to a complete and detailed accounting of monies collected, monies applied, dates of application, interest rates and charges imposed, treatment of General Motors payments including incentives and "wind down" agreement proceeds, and other necessary information in order for Plaintiffs to have an accurate accounting establishing their current status.

**WHEREFORE,** Plaintiffs pray for the following relief:

1.     That the Court issue an order for judgment against Defendant GMAC for amounts due and owing, as alleged herein;

2.     That the Court, alternatively, order Defendant GMAC to provide monies it wrongfully obtained and continues to retain to pay all amounts that remain

due and owing to the State of Minnesota and other third parties for tax,

title, license fees, as well as lien payoffs and warranty program;

3.  That the Court issue an order finding that Defendant GMAC as a lender in

control of Plaintiffs' day to day business activities be directly liable to the

State of Minnesota and other third parties that should have been paid from

the automobile sales transactions it controlled;

4.  That the Court issue an order instructing Defendant GMAC to establish a

constructive trust in the amount of no less than those presently believed to

be owed to the State of Minnesota and various third parties;

5.  That the Court order Defendant GMAC to provide a meaningful and

detailed accounting for all transactions it handled, detailed information as

to monies received and paid to various third parties from each transaction,

and a complete accounting of its relationships with Plaintiffs;

6.  That the Court order Defendant GMAC to pay Plaintiffs' reasonable

attorneys fees, costs and disbursements incurred herein; and

7.  For such other and further relief as this Court deems just and equitable.


January 7, 2010                          **SKOLNICK & SHIFF, P.A.**

                                         William R. Skolnick  #137182
                                         LuAnn M. Petricka  #18505X
                                         527 Marquette Avenue
                                         Minneapolis, MN 55402
                                         Phone (612) 677-7600
                                         Fax (612) 667-7601
                                         wskolnick@skolnick-shiff.com
                                         petricka@visi.com
                                         **ATTORNEYS FOR PLAINTIFFS**

# FORBEARANCE AGREEMENT

## I. Parties

This Forbearance Agreement ("Agreement") is made by and between:

A. Walden Fleet Group, Inc. ("Dealership");

B. Denny Hecker's Cadillac-Pontiac-GMC, Inc., Hudson Auto Sales, Inc., Southview Chevrolet, Co., Walden Fleet Sales Group, Inc., and Walden Investment Company (the "Hecker Affiliates")

C. Dennis E. Hecker ("Owner"); and

D. GMAC LLC.

## II. Recitals

A. GMAC provides wholesale financing, loans, and other credit accommodations to Dealership and the Hecker Affiliates under various agreements ("Credit Accommodations"), including without limitation a Wholesale Security Agreement, as amended from time to time ("WSA"), General Security Agreement, promissory notes and other agreements (collectively "Loan Documents").

B. On August 1, 2005, GMAC entered into a Cross-Collateral, Cross-Default and Cross-Guaranty Agreement (the "Cross Agreement") with the Dealership, Owner, and the Hecker Affiliates.

C. GMAC has a perfected security interest in Dealership's assets to secure all obligations that Dealerships owe to GMAC, and Owner has personally guaranteed payment of all obligations that Dealership owes to GMAC under his guaranty dated December 20, 1989 ("Personal Guaranty").

D. Dealership has placed $310,000 with GMAC as cash collateral pursuant to the terms of a Credit Balance Agreement dated January 3, 2007 (the "CBA").

E. Dealership is in default of its obligations to GMAC because it failed to faithfully and promptly remit to GMAC amounts that GMAC has advanced on Dealership's behalf upon the Dealership's sale or lease of vehicles, as required by the Dealership's WSA ("Out of Trust Amount"). As of November 17, 2008, the Out of Trust Amount is $428,008.08.

F. As of November 18, 2008, Dealership owes GMAC all amounts advanced under Dealership's wholesale credit line, which is immediately due and payable ("Amount Outstanding").

G. The Cross Agreement gives GMAC the right to declare the Dealership's default of its obligations to GMAC to be a default by Owner and each of the Hecker Affiliates.

H. The Loan Documents, including the Cross Agreement, give GMAC the right to take immediate possession of its collateral, including the assets of the Hecker Affiliates.

I. Dealership, Owner and the Hecker Affiliates have indicated their desire to pay the Out of Trust Amount and have asked GMAC to forbear from exercising its rights under the Loan Documents to demand immediate payment of the Amount Outstanding, to declare the Hecker Affiliates in

1



default, and to take possession of its collateral during the period beginning the date of this Agreement through December 8, 2008 ("Forbearance Period").

J. GMAC is willing to forbear from exercising certain of its rights described above, but only under the terms and conditions of this Agreement.

### III. Agreement

In consideration of the above premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, GMAC, Dealership, Owner and the Hecker Affiliates agree as follows:

A. Pursuant to the terms and conditions of this Agreement, during the Forbearance Period GMAC:

    1. Will forbear from exercising its rights under the Loan Documents to:

        a. Demand payment of the Amount Outstanding;

        b. Declare the Hecker Affiliates to be in default; and

        c. Take possession of its collateral.

    2. Notwithstanding GMAC's forbearance and deferral of its rights as described above, interest will accrue, and be payable, on all principal obligations that Dealership, Owner and the Hecker Affiliates owe to GMAC.

B. During the Forbearance Period, Dealership will:

    1. Remain in full compliance with all terms and conditions of the Loan Documents and any other requirements of GMAC.

    2. Provide GMAC access to all the books and records of Dealership's business, including all bank records and bank accounts.

    3. Notify GMAC immediately, in detail, in writing, of any fact or occurrence, which by its happening or with the passage of time may affect the continued solvency or viability of the Dealership.

    4. Permit GMAC representatives to remain on Dealership's premises, at Dealership's expense of $750 per day per representative ("Representativer Fee"). The Representative Fee is due and payable upon Default under this Agreement or the conclusion of the Forbearance Period.

C. Simultaneous with the execution of this Agreement, Dealership will execute a Voluntary Surrender Agreement in the form attached as Exhibit A.

D. No later than December 8, 2008:

    1. Dealership will:

2

    a. Pay GMAC the Out of Trust Amount;

    b. Execute a Revised and Restated CBA, in a form substantially similar to the attached Exhibit B; and

    c. Execute a Joint Notice of Assignment and Demand for Payment, in a form substantially similar to the attached Exhibit C.

2. Denny Hecker's Cadillac Pontiac-GMC, Inc. will:

    a. Provide GMAC with its bank statements and reconciliations for September and October 2008; and

    b. Pay GMAC $105,976 in principal curtailment payments that were due on November 15, 2008.

3. Southview Chevrolet, Inc. will:

    a. Provide GMAC with its bank statements and reconciliations for September and October 2008; and

    b. Pay GMAC $47,875 in principal curtailment payments that were due on November 15, 2008.

4. Walden Investment Company will provide GMAC with its bank statements and reconciliations for October 2008.

E. GMAC will advance up to 90% of the Dealership's cost for used vehicles acquired through an auction, including one of GMAC's internet auctions (e.g., SmartAuction), or directly from GMAC, the maximum advance is 90% of cost. For administrative ease, GMAC will advance up to 100% of the cost and will require a 10% principal reduction payment at the time of the advance.

F. GMAC will advance up to 70% of wholesale value for all other used vehicles. For purposes of this Agreement, "wholesale value" is defined as Blackbook "clean" with no additions for options.

G. The Dealership must pay minimum principal reduction payments on all used vehicles as follows:

| Days in Inventory | Principal Reduction Amount |
|---|---|
| After 90 days: | 10% of initial advance |
| After 120 days: | 10% of initial advance |
| After 150 days: | 10% of initial advance |
| After 180 days: | Payoff |

3

H. Occurrence of any of the following constitutes a default under this Agreement ("Default"):

    1. A further default by Dealership under any Loan Document.

    2. Failure of Owner, the Hecker Affiliates, or Dealership to comply with this Agreement.

    3. Any bankruptcy, insolvency, or receivership proceeding is filed by or against Owner, Dealership or any of the Hecker Affiliates, or if any of them makes an assignment for the benefit of creditors.

    4. GMAC deems itself insecure concerning either jeopardy to its collateral or timely, full payment or performance due in connection with any Loan Document or Personal Guaranty.

I. If a Default occurs:

    1. The Forbearance Period expires immediately;

    2. GMAC may, at its election, immediately terminate Dealership's wholesale credit line and declare all obligations owed by Dealership to GMAC under any and all Loan Documents to be immediately due and payable;

    3. GMAC may exercise any and all of its rights and remedies under this Agreement, any Loan Document, any Personal Guaranty, any other agreement between GMAC and Dealership, the Hecker Affiliates, or Owner, or as provided by law.

J. Owner in his capacity as guarantor under the Personal Guaranty understands, acknowledges, and agrees that nothing contained in this Agreement operates as or will be deemed a waiver of any rights, remedies, or benefits conferred upon GMAC under the Personal Guaranty.

K. Nothing in this Agreement changes any of the Loan Documents, all of which remain in full force and effect as written.

L. Any forbearance, delay, or failure by GMAC in exercising any of its rights or remedies does not constitute a waiver of such rights or remedies or of any existing or future default by either Dealerships or Owners.

M. Dealership, the Hecker Affiliates and Owner, respectively, expressly, and affirmatively waive and release GMAC and all of its directors, officers, employees, representatives, agents, subsidiaries, affiliates, and owners (collectively "GMAC Parties") from any and all past and present claims, defenses, causes of action, or damages arising from any and all dealings or relationships involving GMAC and any GMAC Parties on one hand and Dealerships and Owners on the other hand. This section survives repayment of the Credit Accommodations, any termination of this Agreement, fulfillment of all obligations under the Voluntary Surrender Agreement, Loan Documents, and any other agreement between GMAC and Dealerships or Owners.

N. If any part of this Agreement is held invalid or unenforceable, the remainder of the agreement remains in full force and effect.

4

O. GMAC's agreements under this Agreement do not constitute a waiver of any default by Dealership, the Hecker Affiliates, or Owner or of any of GMAC's rights or remedies under this Agreement, any other agreement between GMAC and Dealership, the Hecker Affiliates, or Owner, or provided by law.

P. This Agreement is governed by, and construed under, the laws of Minnesota, without regard to its rules on conflicts of laws.

Q. This Agreement may be signed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.

R. This Agreement is effective as of November 18, 2008.

**Walden Fleet Group, Inc.**

(Signature)

By:_____

Title:_____

Date:_____

**Denny Hecker's Cadillac-Pontiac-GMC, Inc.**

(Signature)

By:_____

Title:_____

Date:_____

**Hudson Auto Sales, Inc.**

(Signature)

By:_____

Title:_____

Date:_____

**Southview Chevrolet Co.**

(Signature)

By:_____

Title:_____

Date:_____

**Walden Fleet Sales Group, Inc.**

(Signature)

By:_____

Title:_____

Date:_____

**Walden Investment Co.**

(Signature)

By:_____

Title:_____

Date:_____

5

Dennis E. Hecker
_____
(Signature)

Date:_____

GMAC
_____
(Signature)
By:____KEVIN J. BRADY____
Title:____ASST. TRANS.____
Date:___11/18/08_____

6

## VOLUNTARY SURRENDER OF COLLATERAL AGREEMENT

### I.  Parties

This Voluntary Surrender of Collateral Agreement ("Agreement") is made by and between:

A.  Walden Fleet Group, Inc. ("Dealership");

B.  Dennis E. Hecker owner of the Dealership ("Owner"); and

C.  GMAC.

### II.  Recitals

A.  GMAC provides wholesale financing, loans, and other credit accommodations to Dealership under various agreements, including without limitation the Wholesale Security Agreement, as amended from time to time ("WSA"), General Security Agreement, promissory notes, and other agreements (collectively "Loan Documents").

B.  Dealership has granted GMAC a security interest in its assets to secure payment and performance of all obligations owed to GMAC ("Indebtedness"), and Owner has personally guaranteed Dealership's Indebtedness.

C.  Dealership is presently in default under the Loan Documents and desires to immediately surrender possession of all motor vehicles owned by Dealership and the other assets pledged as security for the Indebtedness (collectively "Collateral").

### III. Agreement

In consideration of the above premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, GMAC, Dealership, and Owner agree as follows:

A.  For purposes of effectuating the return of possession of all Collateral to GMAC, Dealership and Owner agree to and do hereby voluntarily surrender possession of the Collateral to GMAC.  In this regard:

    1.  Dealership and Owner hereby continuously and irrevocably authorize and grant GMAC the privilege to immediately and hereafter enter upon all premises of Dealership or Owner to take and retain possession of and, when deemed necessary and desirable by GMAC, to remove from the premises, any and all Collateral in which GMAC holds or claims a security interest.

    2.  GMAC may thereafter sell, lease or otherwise dispose of the Collateral in any manner permitted by any of the Loan Documents or other agreements between GMAC and Dealership or Owner, or as permitted by applicable law.

B.  GMAC will apply the proceeds of the disposition and sale of the Collateral to the payment of the Indebtedness, and any other sums due or to become due under the Loan Documents, including attorneys' fees and expenses incurred in retaking possession of, transporting, storing, preparing for sale, and disposing of and selling the Collateral, in such order and manner as GMAC determines in its sole discretion, unless otherwise directed by law.

C.  The voluntary surrender of the Collateral to GMAC and GMAC's disposition and sale of it does not constitute:

- 1 -



1. A satisfaction or payment in full of the Indebtedness due or to become due under the Loan Documents; or

2. A waiver or relinquishment of any other rights, remedies or benefits conferred upon GMAC (including without limitation, the right to payment of any deficiency balance remaining due after the disposition and sale of the Collateral) under:

   a. The Loan Documents and/or other agreements between GMAC and Dealership or Owner; or

   b. Applicable law.

D. Without limitation, either of the following constitutes a commercially reasonable disposition of the Collateral:

   1. If available, the sale or return of motor vehicles to their manufacturer or distributor under a repurchase or similar type of agreement, even if it results in a deficiency;

   2. Sale of all or a portion of the Collateral at a private dealer-only auction, or to the highest cash bidder of at least three different automotive dealers.

E. Dealership and Owner fully renounce and waive any requirements under Uniform Commercial Code Section 9-611 that GMAC send an authenticated notice to Dealership or Owner of any public sale, private sale, or other intended disposition of the Collateral.

F. If a court of competent jurisdiction holds any part of this Agreement to be invalid or unenforceable, the remainder of the Agreement remains in full force and effect.

G. This Agreement is governed by, and construed under, the laws of the State of Minnesota.

H. The obligations of Owner and Dealership, and the rights of GMAC, under this Agreement will be effective upon Owner or Dealership's default under the Forbearance Agreement between Owner, Dealership, the Hecker entities and GMAC, dated November 21, 2008, or any of the Loan Documents.

WALDEN FLEET GROUP, INC.

(Signature)

By:

Title:

Date:

GMAC

(Signature)

By: KEVIN J. BRADY

Title: ASST. TREAS.

Date: 11/18/08

DENNIS E. HECKER
_____
(Signature)

Date:

## Guarantor Acknowledgement

Guarantor, Dennis E. Hecker, understands, acknowledges, and agrees that nothing contained in this Agreement will operate as or be deemed a waiver of any rights, remedies, or benefits conferred upon GMAC under the guaranty agreements dated December 20, 1989, executed by him in favor of GMAC.

Dennis E. Hecker, Guarantor
_____
(Signature)

By:_____

Date:_____

- 3 -





# NEWS RELEASE

Andy Skoogman, Director of Communications

**FOR IMMEDIATE RELEASE**
June 17, 2009

CONTACT:
Andy Skoogman, 651-201-7171

Alcohol
and Gambling
Enforcement

Bureau of
Criminal
Apprehension

Driver
and Vehicle
Services

Emergency
Communication
Networks

Homeland
Security and
Emergency
Management

Minnesota
State Patrol

Office of
Communications

Office of
Justice Programs

Office of
Traffic Safety

State Fire
Marshal

## STATE PATROL LAUNCHES CRIMINAL INVESTIGATION INTO DENNY HECKER AUTOMOTIVE GROUP
### *State Establishes 1-800 Hotline to Field Calls from Consumers*

ST. PAUL — The Minnesota State Patrol's Motor Vehicle Crimes Task Force is investigating dozens of consumer complaints of felony motor vehicle fraud against Denny Hecker Automotive Group. The complaints are being made by customers who have either purchased a vehicle from, or traded-in a vehicle at, a Denny Hecker Automotive Group dealership over the past several months. The alleged victims are from 15 counties across Minnesota.

Colonel Mark Dunaski, chief of the Minnesota State Patrol, said that there are likely more potential victims and announced that the State Patrol has established a special hotline to field calls from consumers. That number is 1-800-593-5000. Dunaski said investigators are receiving complaints daily.

According to investigators, there are two types of complaints:

> Consumers purchase a vehicle, pay the 6.5 percent sales tax as well as the title and license registration fees to the dealer, but never receive their title or license plates

> Consumers trade in their vehicles and are later informed by their lender that the lien on that vehicle has not been paid off.

In some cases, consumers have complained of being the victim of both scenarios after trading in a vehicle as part of a new car purchase.

Dunaski also said that investigators with the State Patrol, the Bureau of Criminal Apprehension (BCA) and other Minnesota law enforcement agencies executed search warrants at six locations across the state today. Investigators conducted searches at the Denny Hecker Automotive Group corporate headquarters in St. Louis Park, three homes owned by Hecker (two in Medina and one in Cross Lake), and two Denny Hecker Automotive Group dealerships: Southview Chevrolet in Inver Grove Heights and Stillwater GMC Cadillac in Oak Park Heights. The dealership in Oak Park Heights is no longer operating.

"Based on the nature of the complaints we've received so far, we have reason to believe motor vehicle fraud may have occurred," Dunaski said. "The number and severity of citizen complaints prompted us to take action with the goal of resolving the problems both for consumers and the state of Minnesota."

— MORE —

444 Cedar Street, Suite 155 • Saint Paul, Minnesota 55101-5155 • www.dps.state.mn.us



EXHIBIT
B

**Page 2**

It is a felony under Minnesota law for a dealership to fail to remit to the state the sales tax collected from the sale of a motor vehicle, punishable by a prison term of up to five years and a fine not to exceed $10,000. It is also a felony to fail to pay off a lien when a motor vehicle dealer takes a vehicle in trade when there is a lien on that vehicle, punishable by a prison term of up to three years and a fine not to exceed $6,000.

Local law enforcement agencies assisting in this investigation include the Washington County Sheriff's Office, the Crow Wing County Sheriff's Office, Medina Police, St. Louis Park Police and Inver Grove Heights Police.

**About the Motor Vehicle Crime Task Force**

The Minnesota State Patrol Motor Vehicle Crime Task Force was created by legislation in 1998. It is staffed by state troopers and support staff to investigate crimes committed by persons and dealerships regarding the purchase, sale, registration, theft or other fraudulent acts relating to motor vehicles.

###



# StarTribune.com



GET THE LATEST NEWS

## Criminal probe targets Hecker car business

BROWN, Star Tribune staff writers

Last update: June 17, 2009 - 2:15 PM

The state of Minnesota is going after Denny Hecker, whose auto-sales empire has been crumbling for the past several months, following consumer complaints from dozens of consumers.

The State Patrol today announced a criminal investigation into Denny Hecker Automotive Group's practices during the sale and trade-in of motor vehicles. The patrol said it started the investigation after receiving dozens of complaints of alleged felony fraud by Hecker dealerships.

Law enforcement agencies were conducting raids at six Hecker locations: his corporate headquarters in St. Louis Park, dealerships in Inver Grove Heights and Stillwater and at his three homes -- two in Medina and one in Crosslake, Minn.

The patrol said it received complaints from residents in 15 counties and said there potentially were many more victims.



Bruce Bisping, Star Tribune

Officials shut down Denny Hecker's Southview Chevrolet and Minnesota State Patrol officers turned away customers who entered the lot. Large transfer boxes were taken into the dealership.

**Officials raided the car dealer's offices today, and the State Patrol announced a criminal investigation into Denny Hecker Automotive Group's sale and trade-in of motor vehicles.**

By PAUL WALSH, DEE DEPASS and CURT

Advertisement



Family Value health
30 Day
FREE Product Trial

SAVE 10-60%
ON YOUR HEALTH EXPENSES!
DENTAL DISCOUNTS
VISION CARE DISCOUNTS
DOCTOR & HOSPITAL DISCOUNTS
PRESCRIPTION DISCOUNTS
24-7 PHYSICIAN ACCESS - Teledoc
WWW.FVHCARD.COM



Print Powered By Format Dynamics

EXHIBIT
C

# StarTribune.com



It invited consumers who have complaints to call a hot line at 1-800-593-5000.

Consumers complained that they paid the 6.5 percent sales tax as well as title and registration fees when they bought a new car, but never received the title or license plates, according to the patrol.

The second type of complaint came from people who traded in a vehicle, but later were informed by the lender that the lien on that vehicle had not been paid off. In some cases, people complained of both problems after they traded in a car and bought a new one, the patrol said.

Bill Mohrman, corporate counsel for some of hecker's dealership said "we were absolutely floored" by today's raids.

Mohrman blamed the GMAC financing company, and not Hecker dealerships, for apparently failing to pay sales and trade-in proceeds to the state.

According to Mohrman:

In March, GMAC, as the lead secured

creditor, took over control "of the keys" at the table and received all the proceeds from car sales, including money that supposed to go to the state.

When complaints from consumers starting coming in, Hecker's attorneys contacted GMAC's lawyers and the attorney general's office, saying that GMAC was obligated to make these payments to the state, and Hecker's people assumed they were.

Hecker criminal defense attorney Marsh Halberg said that Hecker was "shook and concerned" as law enforcement agents went through his office computers and files in St. Louis Park. Halberg described the atmosphere as the raid continues as "very cordial" as Hecker provided computer passwords and other information to investigatorss.

Hecker was in the St. Louis Park offices meeting with civil and bankruptcy lawyers when agents came in and "froze everything," Halberg said.

Halberg made a point to say that "this is

Advertisement





Print Powered By Format Dynamics

# StarTribune.com



not another Petters case," referring to the giant Ponzi scheme that prominent Twin Cities businessman Tom Petters is alleged to have orchestrated.

State Patrol Col. Mark Dunaski told reporters late this morning that there are "potentially more victims," but he was unsure of how many. "We continue to receive complaints daily," Dunaski said. "We got some complaints yesterday."

He said the complaints first came in about six to seven months ago, adding that it's premature to estimate how much money the alleged fraud involves.

For consumers trading in cars had not had their liens resolved, Dunaski said that forced several customers into paying two car notes.

Dick Daniels of Coon Rapids told the Star Tribune that his son and daughter-in-law are still owed a title for the 2006 Cadillac they bought from Hecker's Stillwater Cadillac dealership at the end of April for $15,000. Daniels went with the couple to check on the car and was told the

vehicle's title would follow in 10 days.

But Hecker closed the dealership seven days later, leaving General Motors to repossess the inventory and customers like the Daniels waiting for vehicle titles. They are still waiting and angry.

Daniels said his family has requested a duplicate title from the state, but might take the matter to court if not resolved.

In a phone interview with the Star Tribune, Hecker said, "If we had the money to pay for the taxes and licenses we would have. OK. We have people who are unpaid because the lenders have the money frozen in an account ... and you can't transfer titles without paying the sales tax and the license fee."

Hecker has been adamant that his financial troubles spiraled out of control after Chrysler Financial froze his credit line in the fall, prompting other financiers to freeze bank accounts and call their loans due.

But customers have complained that their

Advertisement

**Family Value** *Health*

**30 Day**
FREE Product Trial

**SAVE 10 - 60%**
ON YOUR HEALTH EXPENSES

DENTAL DISCOUNTS
VISION CARE DISCOUNTS
DOCTOR & HOSPITAL DISCOUNTS
PRESCRIPTION DISCOUNTS
24/7 PHYSICIAN ACCESS - Teladoc

WWW.FVHCARD.COM

Print Powered By Format Dynamics

# StarTribune.com



inquiries and demands for updates have gone unanswered, which Hecker credits to his bankruptcy and attorneys.

Hecker has been forced to shut or sell 26 of his dealerships and put his Advantage rental car operation into bankruptcy.

He filed for personal bankruptcy about two weeks ago, claiming he owes up to 1,000 creditors up to $1 billion. Thursday, the Minnesota Department of Commerce suspended Hecker's mortgage license, bringing to a formal close a mortgage business that had been advertised widely on billboards and bus ads across the Twin Cities.

Col. Dunaski said there is no reason to believe Hecker's arrest is imminent and that he is free to travel anywhere, even out of the country.

At one point, state troopers lifted yellow police tape to allow about a dozen people to drive their vehicles out of the parking lot. The troopers then blocked the parking lot entrances with State Patrol vehicles.

Janet Oakes, a spokeswoman for the IRS Criminal Investigations unit, said that her office assisted with today's search warrants. Beyond that she refused to comment.

Hecker filed for personal bankruptcy protection about two weeks ago.

Star Tribune staff writer Jenni Pinkley contributed to this report.

Dee DePass • 612-673-7725

Paul Walsh • 612-673-4482

Curt Brown • 612-673-4767

Advertisement



Print Powered By [Format Dynamics]



# Automotive News

## Police raid Hecker homes, businesses

**Kathy Jackson**

Automotive News | June 17, 2009 - 3:48 pm EST

State and federal law enforcement agencies raided dealer Denny Hecker's suburban Minneapolis headquarters and other Hecker properties today.

According to TV and newspaper reports in Minneapolis, agents from the Minnesota State Patrol, the IRS and the Drug Enforcement Agency are investigating complaints from consumers that they paid title and registration fees but never received the items. Some consumers also complain that the liens on their trade-ins were not paid off.

Hecker has not been arrested or charged with a crime.

Agents also are investigating complaints that Hecker did not pay the 6.5 percent sales tax from the sale of cars to the state.

The news reports say Hecker's headquarters near Minneapolis were taped off today while the agents searched for various records there. The reports say the agents also raided two of Hecker's dealerships, one of which is closed, and three of Hecker's homes.

Marsh Halberg, Hecker's criminal defense attorney, could not be reached for comment this afternoon by *Automotive News*.

But Halberg was quoted in the *Minneapolis Star-Tribune* saying that Hecker was "shook and concerned" as police search his office computers in St. Louis Park, Minn. Halberg told the newspaper the atmosphere during the raid was "very cordial" and Hecker provided computer passwords and other information to investigators.

Hecker, 56, filed for bankruptcy on June 4, following a seven-month collapse of his auto empire.

The Chapter 7 filing in U.S. Bankruptcy Court in Minneapolis estimated liabilities of $500 million to $1 billion. The largest creditor is Chrysler Financial, which a judge has ruled Hecker owes $477 million.

Hecker, who once owned several dealerships, a rental car company and fleet and leasing companies, now has only one dealership.



Hecker: Under investigation.
*Photo credit: Reuters*

PRINTED FROM: http://www.autonews.com/apps/pbcs.dll/article?AID=/20090617/ANA05/906179988&template=printart

Entire contents ©2009 Crain Communications, Inc.





WEDNESDAY, JUNE 17, 2009
65° in TWIN CITIES (MORE CITIES)

**MINNESOTA PUBLIC RADIO®**

NEWS & FEATURES     EVENTS     MEMBERSHIP     ABOUT US

THE CURRENT     CLASSICAL
LISTEN           LISTEN
PLAYLIST         PLAYLIST

NEWS
LISTEN
SCHEDULE

RADIO HEARTLAND     : WONDERGROUND RAI

RADIO   Programs

## State Patrol launches criminal probe of Hecker Automotive
June 17, 2009

Golden Valley, Minn. (AP) — The State Patrol says it's launched a criminal investigation into the bankrupt Denny Hecker Automotive Group.

State Patrol Col. Mark Dunaski plans to hold a news conference Wednesday to announce details.

A press release from the Department of Public Safety says the investigation relates to the company's sale and trade-in of motor vehicles. The Patrol will also discuss the creation of a special 1-800 hot line to field complaints from consumers.

Hecker could not be immediately reached for comment. The phone at the Denny Hecker Automotive Group's corporate office in St. Louis Park rang unanswered.

(Copyright 2009 by The Associated Press. All Rights Reserved.)

©2009 Minnesota Public Radio | All rights reserved
480 Cedar Street, Saint Paul, MN USA 55101 | 651-290-1212



EXHIBIT
E





# StarTribune.com

## Authorities raid Hecker offices, homes

With Denny Hecker's businesses unraveling and complaints from car buyers mounting, authorities raided his headquarters, dealerships and three homes.

By PAUL WALSH, DEE DEPASS and CURT BROWN, Star Tribune

Last update: June 17, 2009 - 11:14 PM

Law enforcement agencies raided Denny Hecker's homes and businesses Wednesday as customer complaints mount against the embattled car dealer.

The state is investigating allegations that he failed to pay state taxes, pay license fees or issue car titles after shoppers bought new vehicles. There are also complaints that his dealerships in Inver Grove Heights and Stillwater failed to pay off the loans on customer trade-ins, leaving some buyers with two car payments.

Andy Skoogman, spokesman for the Minnesota State Patrol, which is leading the investigation, said the state received 200 complaints Wednesday from Hecker customers after the state issued a consumer hotline number (800-593-5000) early in the day. Hecker car customers in

15 counties are still waiting for titles, license plates, or for the liens on their traded-in vehicles to be satisfied, state officials said.

State and federal agents raided six Hecker locations Wednesday: his corporate headquarters in St. Louis Park, dealerships in Inver Grove Heights and Stillwater, and three homes – two in Medina and one in Crosslake, Minn.

Bill Mohrman, corporate counsel for some of Hecker's dealerships, said, "We were absolutely floored" by the raids.

Mohrman blamed the GMAC financing company, and not Hecker dealerships, for apparently failing to pay the 6.5 percent state sales tax and failing to pay off loans on cars that were traded in.

A GMAC spokesman denies the lender's involvement.

Wednesday's raids are the latest in what has become a very public unraveling of Hecker's auto empire, which once reported annual sales of $6.8 billion. But he has been forced to shut or sell 25 of his 26 dealerships and put into bankruptcy his Advantage rental car agency. Last week the Minnesota Department of Commerce suspended Hecker's mortgage license, bringing to a formal close a mortgage business that had been advertised widely on billboards and bus ads across the Twin Cities.

Advertisement



Print Powered By FormatDynamics

**EXHIBIT F**



# StarTribune.com

Hecker filed for personal bankruptcy on June 4, claiming he owes up to 1,000 creditors up to $1 billion.

The businessman has been adamant that his financial troubles spiraled out of control after Chrysler Financial froze his credit line in the fall, prompting other financiers to freeze bank accounts and demand that loans be repaid.

### Frozen accounts

According to Mohrman, in March, GMAC, as the lead secured creditor, took control "of the keys" and received all the proceeds from car sales, including money that was supposed to go to the state.

When complaints from consumers started coming in, Hecker's attorneys contacted GMAC's lawyers and the attorney general's office, saying that GMAC was obligated to make these payments to the state, and Hecker's people assumed they were, according to Mohrman.

In an interview with the Star Tribune last week, Hecker said that he would pay taxes and title fees if he could, but said funds had been frozen by his auto financing companies. "We don't have the money available, they have it in a lock box account," Hecker said.

GMAC firmly denied any role in not paying the state. The lender repossessed its inventory in

March, but assessed all of Hecker's recent car sales and wrote Hecker Automotive a check for "thousands of dollars" so that it could pay the state taxes and license registration fees, GMAC spokeswoman Mike Stoller said. "We have fulfilled all our obligations."

In a statement, GMAC said it is not a party to trade-in transactions, so "the dealer, not GMAC, has the responsibility to satisfy all liens."

### 'Shook and concerned'

Hecker criminal defense attorney Marsh Halberg said Hecker was in the St. Louis Park offices meeting with civil and bankruptcy lawyers when agents came in and "froze everything." He said Hecker was "shook and concerned," though the atmosphere remained cordial as Hecker and his staff provided agents with computer passwords and even markers as they combed through paperwork and computer files.

Halberg said that Hecker and his civil attorneys are considering suing GMAC as early as this week for failing to pay the state and issue titles and fees. "He disputes" GMAC's account of what took place and said that Hecker Automotive made every effort to work with GMAC to make sure the state and consumers "were made whole," Halberg said.

Halberg made a point to say that "this is not another Petters case," referring to the giant Ponzi

Advertisement



Send flowers for any occasion
Bouquets $19.99 +s/h
from ProFlowers
Order ONLY at
proflowers.com/happy
or call 1-877-888-0688

Print Powered By Format Dynamics



# StarTribune.com

scheme that prominent Twin Cities businessman Tom Petters is alleged to have orchestrated.

State Patrol Col. Mark Dunaski said Wednesday complaints first came in about six to seven months ago, adding that it's premature to estimate how much money the alleged fraud involves.

Dick Daniels of Coon Rapids told the Star Tribune that his son and daughter-in-law are still owed a title for the 2006 Cadillac they bought from Hecker's Stillwater Cadillac dealership at the end of April for $15,000. Daniels went with the couple to check on the car and was told the vehicle's title would follow in 10 days.

But Hecker closed the dealership seven days later, leaving GMAC to repossess the inventory and customers like the Daniels waiting for vehicle titles. They are still waiting and angry.

Daniels said his family has requested a duplicate title from the state, but might take the matter to court if not resolved.

Dunaski said there is no reason to believe Hecker's arrest is imminent and that he is free to travel anywhere, even out of the country.

Janet Oakes, a spokeswoman for the IRS Criminal Investigations unit, said that her office assisted with today's search warrants. Beyond that she refused to comment.

Agents from the Drug Enforcement Agency office in Minneapolis were asked to assist the State Patrol in the search of Hecker's offices because there were not enough troopers available, a DEA spokesman said Wednesday. "There's no DEA drug angle to this," he said.

Star Tribune staff writers Paul McEnroe and Jenni Pinkley contributed to this report. Dee DePass • 612-673-7725 Paul Walsh • 612-673-4482 Curt Brown • 612-673-4767

Advertisement



Print Powered By Format Dynamics



# KSTP.com—5 EYEWITNESS NEWS

## FBI Raids Hecker Headquarters
Updated: 07/30/2009 2:51 PM KSTP.com
By: Becky Nahm

The Federal Bureau of Investigation raided bankrupt Twin Cities auto dealer Denny Hecker's Golden Valley headquarters Thursday, launching yet another criminal probe of the embattled businessman.

Federal agents served a search warrant around 10 a.m. and have been seen searching the building, which is in an office park off of Interstate 394.

The agents are looking into allegations of money laundering, bankruptcy fraud, and conspiracy, according to one of Hecker's attorneys, Marsh Halberg.

This is the second raid on Hecker's headquarters in two months.

On June 17, Minnesota State Patrol troopers searched Hecker's headquarters, four homes of his homes, and two dealerships.

The agency is looking into customer claims that Hecker dealerships never paid the required tax, title, or insurance on cars and other claims that Hecker's dealerships never paid off the lien on trade-in vehicles.

Hecker's attorneys said GMAC was responsible for the issues that sparked the complaints. GMAC said it was not. Hecker is suing GMAC.

Hecker is also fighting several lawsuits.

Chrysler Financial Services has filed two lawsuits-one accusing Hecker of fraud filed earlier this month and another filed in April, in which Chrysler was awarded nearly $477 million.

In June, a civil complaint was filed against Hecker, claiming he was shuffling money between several of his companies in order to defraud his creditors.

Hecker declared Chapter 7 personal bankruptcy in June. According to court papers, he said he owes up to $1 billion to 1,000 creditors.

Stay with 5 EYEWITNESS NEWS for continuing coverage of this developing story, including live reports beginning at 4:30 p.m.

**Stay with 5 EYEWITNESS NEWS for continuing coverage of this developing story, including live reports beginning at 4:30 p.m.**



EXHIBIT
6



Minneapolis / St. Paul Business Journal - July 30, 2009
/twincities/stories/2009/07/27/daily47.html

Members: Log in | Not Registered? Register for free extra services.

# BUSINESS JOURNAL

Thursday, July 30, 2009

## Report: FBI searching Hecker's HQ

Minneapolis / St. Paul Business Journal

The Federal Bureau of Investigation on Thursday morning served search warrants for the headquarters of **Hecker Automotive Group Inc.**, KARE-11 television reports.

Officials from the Internal Revenue Service accompanied the FBI to the headquarters. Embattled auto magnate Denny Hecker is out of town, but his lawyer took a call from agents asking for keys to enter the headquarters, in Golden Valley. Hecker's attorney complied, but said he was unsure of what the agents were looking for, as the search warrants were sealed.

Hecker Automotive Group's headquarters were searched earlier this year, following accusations that he owed sales tax payments to the state.

Denny Hecker also has filed for Chapter 7 bankruptcy.

All contents of this site © American City Business Journals Inc. All rights reserved.



EXHIBIT



# StarTribune.com



## Feds again raid Hecker's HQ



Carlos Gonzalez, Star Tribune

Federal agents on Thursday were looking through the Hecker headquarters in St. Louis Park for records dating to 2002 that could link Hecker to financial crimes.

### FBI and IRS agents were hunting for evidence of such crimes as fraud, conspiracy and money laundering.

By DEE DEPASS and PAUL WALSH, Star Tribune Staff Writers

Last update: July 30, 2009 - 9:31 PM

For the second time in two months, federal agents on Thursday raided the now-silent headquarters of bankrupt auto mogul Denny Hecker, searching for evidence of bankruptcy fraud, conspiracy, mail fraud, wire fraud and money laundering.

Armed with a search warrant, FBI and IRS agents entered the Denny Hecker Automotive Group headquarters in St. Louis Park.

Hecker has not been charged with any such crimes.

"Denny obviously denies any wrongdoing," said his criminal defense attorney, Marsh Halberg.

Halberg said he got a call from the Federal Bureau of Investigation on Thursday morning requesting access to Hecker's office building. Hecker, who is out of town, gave him the OK over the phone to let in the agents.

"I pledged to be fully cooperative," Halberg said. He described the search warrant as "very broad."

The warrant seeks evidence of alleged fraud going back to 2002. Some of the items listed in the warrant are very specific.

The once-lively headquarters at 500 Ford Road in St. Louis Park was subdued Thursday. Agents wearing blue FBI jackets took briefcases inside and began a long search.

State investigators and agents with the IRS Criminal Investigations Division searched the office and five other Hecker properties last month

Advertisement

get proven, proactive
identity theft protection

⊙ LifeLock.
#1 In Identity Theft Protection®

1-888-896-1878

Print Powered By  FormatDynamics™

EXHIBIT
I

# StarTribune.com



seeking evidence that Hecker's dealerships had failed to relay vehicle sales taxes to the state. The state was also investigating hundreds of customer complaints that Hecker had failed to pay off loans for trade-in vehicles and failed to process the paperwork on customer car titles and license plates.

This time around, the search warrants touch nearly every aspect of Hecker and his businesses, which have been accused of fraud, forgery, embezzlement and other wrongdoing by bankruptcy trustees, State Farm Mutual Auto Insurance or Hecker's longtime financing partner, Chrysler Financial.

Hecker and his attorneys previously denied wrongdoing and said they will fight the allegations in court. Reached by cell phone Thursday, Hecker referred all inquiries to Halberg.

Agents searched for evidence of bankruptcy fraud, conspiracy, mail fraud, wire fraud and money laundering in computers, contracts, canceled checks, files, Rolodexes and other documents.

The warrant indicates that they were looking for "altered or forged" invoices, bills of sales or other documents, as well as "fraudulently obtained floor plan agreements" -- the financing behind a dealership's inventory. They looked for materials related to Hecker's dealings with Chrysler Financial, Hyundai Motor, Toyota, General Motors,

Suzuki, Nissan and Mitsubishi, as well as GE Capital, GELCO, GE Fleet and even the financing for his repossessed Bombardier Challenger aircraft.

The breadth of the search indicates authorities are looking for evidence related to allegations made in civil cases, in bankruptcy filings and by business associates.

Part of the search warrant appears related to a 2005 Automotive News article, which reported that Hecker allegedly traded $15.8 million worth of advertising credits to Mitsubishi in exchange for at least 1,100 cars. Mitsubishi managers told the publication the ad credits turned out to be virtually worthless. FBI agents searched for records relating to those allegations, including "advertising time credits or discount credits for commercial TV airtime" related to Mitsubishi.

In September, State Farm Mutual Auto Insurance Co. sued Hecker's Advantage Rent A Car and Southwest-Tex Leasing companies, accusing them of inflating auto repair bills on hundreds of rental car claims. State Farm is demanding more than $1 million in damages. Documents involving both of those Hecker companies are part of the search warrant.

Agents also looked for records involving Chrysler Financial, which sued Hecker in January for defaulting on $550 million worth of loans. It recently won a judgment for $477 million but

Advertisement



Print Powered By FormatDynamics

# StarTribune.com


GET THE LATEST NEWS.

sued Hecker again this month, accusing him of fraud and embezzlement and of forging Hyundai Motor lease documents to secure $83 million in loans from Chrysler Financial. Chrysler Financial has asked the bankruptcy court to refuse to write off the $83 million.

Hecker denied the allegations. He accused Chrysler Financial of ruining his business by unfairly pulling his credit line in October. That prompted bank accounts to be frozen and his dealership funds to dry up, Hecker said in past interviews.

But allegations continued to mount against Hecker, whose once ubiquitous ads made him practically a household name in Minnesota.

In June, a U.S. bankruptcy trustee accused Hecker's Advantage Rent A Car and five other Hecker companies of civil fraud, claiming they diverted up to $148 million in funds before Advantage filed for bankruptcy in December. Hecker's attorneys denied those allegations, saying the trustee failed to consider the money went to repay loans.

In addition to Chrysler Financial, Hecker owes millions to Hyundai, Toyota Motor Credit, the IRS, GELCO, GMAC Mortgage, business partners, cities, banks and employees and hundreds of other creditors.

Hecker filed a personal bankruptcy liquidation petition June 4. In a filing this month, he said he owes creditors $767 million and had just $18.5 million in assets.

This month, bankruptcy trustee Randy Seaver grilled Hecker in a hearing about how he paid bills, when he paid stock margin calls, bought or sold or lost certain property, and whether he had deposited funds in offshore accounts or with friends or family members. The search warrant shows agents are looking for evidence of money transfers to third parties.

Dee DePass • 612-673-7725

Paul Walsh • 612-673-4482

Advertisement


Send flowers for any occasion
Bouquets $19.99
from +s/h
ProFlowers
Order ONLY at
proflowers.com/happy
or call 1-877-888-0688

Print Powered By FormatDynamics



# StarTribune.com



## Report: More search warrants target Hecker HQ

By PAUL WALSH, Star Tribune

Last update: July 30, 2009 - 2:30 PM

Search warrants were served this morning at Denny Hecker automotive group's headquarters in Golden Valley by FBI agents, who were joined by IRS officers, KARE-TV is reporting.

KARE reports that Hecker's criminal defense attorney, Marsh Halberg, said he received a call from the FBI today requesting keys for the building. Halberg said he called Hecker, who is out of town, and was given the OK to let the agents in and deal with other housekeeping matters.

"We're cooperating fully in every way we can," KARE quoted Halberg as saying.

These are the same offices that were the subject of state and federal raids last month. The state searches were connected to accusations that Hecker's dealerships had collected money for sales taxes on vehicles but failed to relay that money to the state.

Hecker's creditors are collectively owed $767 million. The former auto mogul filed for bankruptcy protection June 4, claiming just $18.5 million in assets.

Hecker has been sued twice by Chrysler Financial, once for defaulting on $477 million in loans and once for allegedly falsifying documents to secure more loan money than he was entitled to receive. Hecker acknowledged the debt but has denied the forgery allegations.

In addition to Chrysler Financial, Hecker also owes millions to Hyundai, Toyota Motor Credit, The IRS, GELCO, GMAC Mortgage, business partners, cities, banks and employees around the country and hundreds of other creditors.

Paul Walsh • 612-673-4482

Advertisement



Print Powered By [FormatDynamics]



EXHIBIT
J



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
|---|---|---|
| | ) | |
| Plaintiff, | ) | (18 U.S.C. § 2) |
| | ) | (18 U.S.C. § 1343) |
| v. | ) | (18 U.S.C. § 1349) |
| | ) | (18 U.S.C. § 1957) |
| 1.  DENNIS EARL HECKER and | ) | |
| 2.  STEVEN JOSEPH LEACH, | ) | |
| | ) | |
| Defendants. | ) | |

THE UNITED STATES GRAND JURY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Indictment:

1.   Defendant DENNIS EARL HECKER, a resident of Minnesota, owned and operated in Minnesota and elsewhere automobile dealerships as well as businesses that provided fleet vehicles to rental car companies, including rental car companies that HECKER owned in whole or in part.

2.   HECKER operated his businesses under numerous corporate names (collectively, the "Hecker organization"). The corporate headquarters for the Hecker organization was at 500 Ford Road, St. Louis Park, Minnesota.

3.   Defendant STEVEN JOSEPH LEACH, a resident of Minnesota, was a senior officer of HECKER's fleet leasing businesses. In or about December 2007, LEACH resigned from the Hecker organization.



U.S. v. Dennis Earl Hecker, et al.

4.    To fund the businesses and to purchase vehicles, HECKER and the Hecker organization borrowed money from commercial lending companies ("lenders"), including Chrysler Financial Services Americas LLC and its predecessors, such as DaimlerChrysler Services North America LLC and DaimlerChrysler Financial Services Americas LLC (collectively, "Chrysler Financial"), and others.  HECKER personally guaranteed repayment of amounts loaned to the Hecker organization by Chrysler Financial and other lenders.

5.    The vehicles that HECKER and the Hecker organization purchased were the primary collateral for the vehicle financing. In addition, HECKER and the Hecker organization were obligated by agreement and otherwise to hold proceeds from the sale of vehicles in trust and to pay the proceeds promptly to the lender that financed the vehicles, in payment of any balance owed to the lender on such financing.

6.    The fleet vehicles that HECKER and the Hecker organization purchased were generally categorized by automobile manufacturers as either "repurchase" or "risk."  "Repurchase" vehicles were subject to a guarantee that the automobile manufacturers would in effect buy back the vehicles for a set price after a certain period of time and subject to certain conditions. "Risk" vehicles had no such repurchase guarantee.  Thus, "risk" vehicles exposed HECKER, the Hecker organization, and lenders to

U.S. v. Dennis Earl Hecker, et al.

greater financial risk.  Whether the vehicles at issue were categorized as "repurchase" or "risk" vehicles was material to lenders.

7.  To induce HECKER, the Hecker organization, and other businesses to purchase fleet vehicles, automobile manufacturers typically offered incentive payments.  Incentive payments, which could be upwards of thousands of dollars per vehicle, were a form of "cash back" that the purchaser, such as HECKER and the Hecker organization, received after buying the vehicles.  Whether HECKER and the Hecker organization received incentive payments and the amount of any incentive payments were material to lenders.

8.  By approximately June 2009, HECKER had largely closed down operations of the Hecker organization and had filed personal bankruptcy.

## COUNT 1
(Conspiracy to Commit Wire Fraud)

9.  The Grand Jury hereby realleges and incorporates paragraphs 1 through 8 of this Indictment as if stated in full herein.

10.  Beginning at least in or about September 2007, and continuing through at least in or about June 2009, the exact dates being unknown to the Grand Jury, in the State and District of Minnesota and elsewhere, the defendants,

3

U.S. v. Dennis Earl Hecker, et al.

**DENNIS EARL HECKER and
STEVEN JOSEPH LEACH,**

knowingly and intentionally combined, conspired, confederated, and agreed with each other, and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property from lenders and others by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice, to knowingly cause to be transmitted in interstate commerce, by means of wire communications, certain writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

11. The unlawful purpose of this conspiracy was to enable HECKER, the Hecker organization and others to obtain millions of dollars from various sources, including financing from lenders, incentive money from automobile manufacturers, and sale proceeds from vehicles, all by making material false statements, false representations and omissions.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means, among others, of this conspiracy were as follows:

4

U.S. v. Dennis Earl Hecker, et al.

12. To obtain millions of dollars from various sources, money which was diverted in part to fund HECKER's extravagant lifestyle, the defendants and others made material false statements, false representations, and omissions.

13. The material false statements, false representations, and omissions included presenting lenders with fraudulently altered documents that purported to but did not in fact represent the actual terms automobile manufacturers had offered HECKER and the Hecker organization with regard to fleet vehicle purchases.

14. The material false statements, false representations, and omissions included misrepresentations and omissions to lenders with respect to the nature and value of the collateral, that is, the vehicles that secured the lenders' financing.

15. The material false statements, false representations, and omissions included misrepresentations and omissions to lenders with respect to millions of dollars in incentive payments received by HECKER and the Hecker organization from automobile manufacturers.

16. The material false statements, false representations, and omissions included misrepresentations and omissions to lenders with respect to vehicle sales proceeds. Namely, after HECKER and the Hecker organization sold vehicles that lenders had financed, in a significant number of instances, HECKER and others at his direction intentionally and fraudulently kept the vehicle sales proceeds for

5

the benefit of HECKER and the Hecker organization, rather than holding those proceeds in trust and paying the proceeds promptly to the lender that financed the vehicle.

17. The material false statements, false representations, and omissions included misrepresentations and omissions to retail customers of the Hecker organization's dealerships. Namely, after HECKER and the Hecker organization received vehicle sales proceeds, including amounts intended by the customer to pay for sales tax, title, and license fees, in a significant number of instances, HECKER and others at his direction intentionally and fraudulently kept the tax, title, and license portion for the benefit of HECKER and the Hecker organization, rather than holding that portion in trust and paying it promptly to the state.

18. At least in part to prevent the conspiracy and fraud from coming to light and/or being reported to the authorities, the defendants and others engaged in cover-up and lulling communications with various individuals and entities.

19. In or about June 2009, HECKER filed personal bankruptcy in an attempt to avoid his repayment obligations to the lenders. Despite filing personal bankruptcy, and despite the hundreds of millions of dollars owed to his lenders and others, HECKER, with the assistance of others, has concealed assets and has continued to live an extravagant lifestyle.

6

U.S. v. Dennis Earl Hecker, et al.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-6
(Wire Fraud)

20.   The   Grand   Jury   hereby   realleges   and   incorporates paragraphs 1 through 8 and 12 through 19 of this Indictment as if stated in full herein.

21.   Beginning   at   least   in   or   about   September   2007,   and continuing through at least in or about June 2009,  the exact dates being  unknown  to  the  Grand  Jury,  in  the  State  and  District  of Minnesota and elsewhere, the defendants,

**DENNIS EARL HECKER** and
**STEVEN JOSEPH LEACH,**

aiding  and  abetting  each  other,  and  aided  and  abetted  by  others known  and  unknown  to  the  Grand  Jury,  knowingly  and  intentionally devised a scheme and artifice to defraud and to obtain millions of dollars in money and property from Chrysler Financial and others by means of material false and fraudulent pretenses, representations, and promises.

### THE "HYUNDAI" FRAUD SCHEME

It was a part of the scheme and artifice that:

22.   In  or  about  the  fall  of  2007,  the  defendants  negotiated to purchase over 5,000 Hyundai vehicles from Hyundai Motor America ("HMA") for the Hecker organization's fleet leasing business.

7

<u>U.S. v. Dennis Earl Hecker, et al.</u>

23.  Specifically, in approximately November 2007, HMA provided the Hecker organization with letters reflecting the deal the defendants had negotiated with HMA.  In the letters, HMA offered to sell the Hecker organization approximately 1) 605 "repurchase" vehicles ("605 repurchase letter"), 2) 4,250 "risk" vehicles ("4,250 risk letter"), and 3) 610 "risk" vehicles ("610 risk letter").  Thus, in the fall of 2007, HMA offered to sell the Hecker organization approximately 4,860 "risk" vehicles and approximately 605 "repurchase" vehicles, for a total of approximately 5,465 Hyundai vehicles.

24.  As part of the deal with HMA, the defendants negotiated to receive millions of dollars, upwards of over approximately $4,000 per "risk" vehicle, in incentive payments from HMA.

25.  In or about the fall of 2007, the defendants arranged to obtain approximately $80 million in fleet lease financing for the Hyundai vehicles from Chrysler Financial.  To obtain the fleet lease financing, the defendants made material false statements, false representations and omissions.

26.  Specifically, on or about November 15, 2007, at HECKER's direction, and without HMA's permission or awareness, LEACH arranged to create a fraudulently altered HMA letter.  Namely, LEACH provided a Hecker organization employee with the actual 605 repurchase letter.  LEACH directed this person to cover existing

8

language on the letter with a taped-on insert so that it would appear as if HMA was offering to sell the Hecker organization 4,855 "repurchase" Hyundai vehicles.  In fact, as the defendants well knew, HMA had made no such offer.  The purported "repurchase" number of 4,855 was calculated to reflect the approximate total number of "risk" vehicles that the defendants were already in the process of purchasing from HMA, but for which the defendants needed permanent financing.

27.  On or about November 15, 2007, LEACH caused the fraudulently altered HMA letter to be faxed from the Hecker organization in St. Louis Park, Minnesota to HECKER at the Detroit Metropolitan Wayne County Airport in Michigan.

28.  On November 15, 2007, after HECKER received the fraudulently altered HMA letter in Michigan, HECKER presented it to Chrysler Financial, along with the actual 610 risk letter.  HECKER falsely represented the two documents as the deal he had negotiated with HMA.  HECKER intentionally and affirmatively concealed from Chrysler Financial two of the actual HMA offer letters, the 4,250 risk letter and the 605 repurchase letter.  Thus, HECKER, aided and abetted by LEACH, misled Chrysler Financial into believing HMA had offered to sell the Hecker organization a large number of "repurchase" vehicles, approximately 4,855, and a much smaller number of "risk" vehicles, approximately 610, for a total of

9

approximately 5,465 Hyundai vehicles. In fact, as the defendants

well knew, HMA's deal to sell a total of approximately 5,465

Hyundai vehicles consisted mostly of "risk" vehicles (approximately

4,860), with a much smaller number (approximately 605) of

"repurchase" vehicles.

29. Thus, in or about November 2007, through the fraudulently

altered HMA letter and through other material false statements,

false representations, and omissions, the defendants misled

Chrysler Financial into financing thousands of Hyundai "risk"

vehicles believing that the vehicles were "repurchase" vehicles.

As a result, the collateral for Chrysler Financial's financing was

substantially and materially less than what the defendants

represented it to be. Namely, the majority of the Hyundai vehicles

were not subject to any guarantee from HMA that it would repurchase

the vehicles, and therefore Chrysler Financial was at significant

financial risk that the vehicle sale proceeds ultimately would be

insufficient to pay off the Hyundai vehicle financing.

30. In particular, starting in or about mid-November 2007,

the defendants caused others within the Hecker organization to

prepare and to send to Chrysler Financial a number of funding

packages, including security agreements and vehicle schedules, the

content of which falsely represented that the vehicles that

Chrysler Financial was financing for HECKER and the Hecker

10

organization were "repurchase" vehicles when in fact they were "risk" vehicles.   Thus, through the funding packages, the defendants further misled Chrysler Financial as to the nature and value of Chrysler Financial's collateral.

31.   In or about November 2007, the Hecker organization received HMA incentive payments, including a wire of approximately $7.8 million and a wire of approximately $9.4 million, after the Hecker organization began purchasing the Hyundai "risk" vehicles from HMA. Although information regarding the incentive payments to HECKER and the Hecker organization was material to Chrysler Financial, the defendants, through the fraudulently altered HMA letter and otherwise, intentionally and affirmatively concealed the incentive payments from Chrysler Financial.

32.   In addition, as a result of the defendants' material false statements, false representations and omissions, HECKER and the Hecker organization were able to obtain Hyundai vehicles, which they were then able to lease to rental car companies, including those in which HECKER held an ownership interest. Thus, HECKER and the Hecker organization were able to generate revenue from such vehicles through the fraud.

33. At least in part to prevent the fraud from coming to light and/or being reported to the authorities, the defendants and

11

<u>U.S. v. Dennis Earl Hecker, et al.</u>

others engaged in cover-up and lulling communications with various individuals and entities.

34. In or about December 2007, after making admissions regarding the fraud, LEACH tendered his resignation to HECKER, in an attempt to distance himself from the fraud in which he had participated.

35. At least in part to prevent the fraud from coming to light and/or being reported to the authorities, HECKER, with the help of others, arranged to have Hyundai Motor Finance Company, now known as Hyundai Capital America ("Hyundai Capital"), refinance a portion of the Hyundai vehicles financed by Chrysler Financial.

36. Despite the Hyundai Capital refinancing and some other payments, HECKER and the Hecker organization did not fully repay the money that Chrysler Financial provided in reliance on the defendants' material false statements, false representations, and omissions. After HECKER and the Hecker organization failed to repay Chrysler Financial, and after Chrysler Financial sold its collateral, including the Hyundai vehicles that did not have the HMA repurchase guarantee represented by the defendants, Chrysler Financial suffered a financial loss that exceeds approximately $10 million.

37. As part of a personal bankruptcy proceeding, HECKER sought a discharge of the more than approximately $10 million he

12

U.S. v. Dennis Earl Hecker, et al.

owed to Chrysler Financial as a result of the Hyundai fraud scheme (as well as hundreds of millions of dollars in other debt HECKER owed to Chrysler Financial, Hyundai Capital and others), in an attempt to avoid his repayment obligations. Despite filing personal bankruptcy, HECKER, with the assistance of others, has concealed assets and has continued to live an extravagant lifestyle.

## THE WIRES

38. On or about the dates set forth below, in the State and District of Minnesota and elsewhere, and for the purpose of executing and attempting to execute the scheme and artifice, the defendants,

### DENNIS EARL HECKER and
### STEVEN JOSEPH LEACH,

aiding and abetting each other, and aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the scheme and artifice, knowingly caused to be transmitted in interstate commerce the interstate wire communications described below:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 2 | 11/15/07 | Wire transfer of approximately $7.8 million from HMA's account at Bank of America in New York to the Hecker organization's account at Wells Fargo Bank in Minnesota |

13

U.S. v. Dennis Earl Hecker, et al.

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| 3 | 11/15/07 | Facsimile transmission of fraudulently altered HMA letter from the Hecker organization in Minnesota to Detroit Metropolitan Wayne County Airport in Michigan |
| 4 | 11/19/07 | Email from Chrysler Financial in Michigan to HECKER in Minnesota, cc: LEACH and others, re. the Hyundai program |
| 5 | 11/30/07 | Wire transfer of approximately $9.4 million from HMA's account at Bank of America in New York to the Hecker organization's account at Wells Fargo Bank in Minnesota |
| 6 | 10/25/08 | Telephone discussion between HECKER in Mexico and an individual with HMA in California regarding fraudulently altered HMA letter |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 7
(Transactional Money Laundering)

39. The Grand Jury hereby realleges and incorporates paragraphs 1 through 8 and 12 through 19 and 22 through 37 of this Indictment as if stated in full herein.

40. On or about November 30, 2007, in the State and District of Minnesota and elsewhere, the defendant,

**DENNIS EARL HECKER,**

aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction

14

<u>U.S. v. Dennis Earl Hecker, et al.</u>

by, through, and to a financial institution, affecting interstate commerce in criminally-derived property of a value greater than $10,000, that is, a wire transfer of approximately $500,000 from the Hecker organization's account at Wells Fargo Bank to HECKER's personal account at Wells Fargo Bank, such property having been derived from specified unlawful activity, namely, wire fraud and conspiracy to commit wire fraud.

All in violation of Title 18, United States Code, Sections 1957 and 2.

### FORFEITURE ALLEGATIONS

Counts 1 through 7 of this Indictment are hereby realleged and incorporated as if fully set forth herein by reference, for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c).

As the result of the offenses alleged in Counts 1 through 6 of this Indictment, the defendants,

**DENNIS EARL HECKER** and
**STEVEN JOSEPH LEACH,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which

15

constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 2, 1343 and 1349.

As a result of the offenses alleged in Count 7 of the Indictment, the defendant,

**DENNIS EARL HECKER,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in said money laundering violation and all property traceable to such property, including the sum of money involved in Count 7.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and by Title 28, United States Code, Section 2461(c).

All in violation of Title 18, United States Code, Sections 2, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1343, 1349, 1957 and Title 28, United States Code, Section 2461(c).


**A TRUE BILL**


_____          _____

UNITED STATES ATTORNEY          FOREPERSON

16