# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| DENNY HECKER'S CADILLAC-PONTIAC-GMC, INC.; WALDEN FLEET GROUP, INC.; and SOUTHVIEW CHEVROLET, CO., | Civil No. 10-0068 (JRT/RLE) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| GMAC INC., | |
| Defendant. | |

LuAnn M. Petricka, **PETRICKA LAW FIRM**, , 527 Marquette Avenue, Suite 2100, Minneapolis, MN 55402, for plaintiffs.[1]

Michael W. Haag, **FOLEY & MANSFIELD, PLLP**, 250 Marquette Avenue, Suite 1200, Minneapolis, MN 55401, for defendant.

Several automobile dealerships owned primarily by Dennis E. Hecker brought suit against GMAC Inc. ("GMAC"), alleging that after GMAC demanded and received the full proceeds from vehicle sales in exchange for release of title for those vehicles, GMAC improperly retained the portions of those proceeds that were allocated for sales tax, vehicle registration, licensing fees, and lien payoffs for trade-in vehicles. The case is now before the Court on GMAC's motion to dismiss. For the reasons discussed below, the Court grants GMAC's motion.

---

[1] On March 29, 2010, the Court granted Skolnick & Shiff's Motion to Withdraw as Counsel. (Docket No. 24.)

**BACKGROUND**

Denny Hecker's Cadillac-Pontiac-GMC, Inc. ("Stillwater Cadillac"), Walden Fleet Group ("Walden Fleet"), and Southview Chevrolet Co. ("Southview Chevrolet") (collectively, "plaintiffs") are Minnesota corporations no longer in operation whose "prior principal place[s] of business" were in Minnesota. (Compl. ¶¶ 1-3, Docket No. 1.) Stillwater Cadillac owned an automobile dealership. (*Id.* ¶ 1.) Walden Fleet and Southview Chevrolet were "primarily engaged in the automobile dealership business." (*Id.* ¶¶ 2-3.)

GMAC is the successor to a Delaware limited liability company with its principal place of business in Michigan. (*Id.* ¶ 4.) GMAC is "primarily engaged in the business of providing financing to automobile dealerships." (*Id.*) GMAC "provided the primary financing to Plaintiffs' automobile dealerships for numerous years." (*Id.* ¶ 7.) GMAC loaned money to plaintiffs, which they then used to purchase vehicles from General Motors. After plaintiffs sold those vehicles, they used a portion of the sale proceeds to repay those loans. In this capacity, GMAC "had a first security interest in all of Plaintiffs' assets, including the new vehicles for sale and the 'dealer incentives' GM provided" to plaintiffs. (*Id.* ¶ 12.)

The complaint alleges that in late 2008, due to "the precipitous decline in the American economy . . . and other events beyond Plaintiffs' control, Plaintiffs were unable to sell automobiles they had purchased from General Motors through GMAC."

(*Id.* ¶ 10.)  At the same time, plaintiffs "had severe cash liquidity issues" because General Motors announced it was delaying payments of dealer incentives.  (*Id.* ¶ 11.)

The complaint attaches and incorporates by reference two documents.  The first is a 2008 Forbearance Agreement.  (*Id.* ¶ 8; *id.* Ex. A.)  The parties to the Forbearance Agreement are GMAC, plaintiffs, and other entities that are not party to this action. (Forbearance Agreement at 1, Compl. Ex. A, Docket No. 1.)  The second document is a 2008 Voluntary Surrender of Collateral Agreement (the "Voluntary Surrender Agreement").  The parties to the Voluntary Surrender Agreement are GMAC, Walden Fleet, and Dennis E. Hecker.[2]  (Voluntary Surrender Agreement at 1, Compl. Ex. B, Docket No. 1.)  The parties executed both agreements on November 18, 2008.

Under the terms of these agreements, GMAC "has a perfected security interest in [plaintiffs'] assets to secure all obligations that [plaintiffs'] owe to GMAC." (Forbearance Agreement at 1, Compl. Ex. A, Docket No. 1.)  The Forbearance Agreement declares plaintiffs to be in default of their obligations and states that GMAC has "the right to take immediate possession of [plaintiffs'] collateral, including the assets of the [plaintiffs]."  (*Id.*)  It then sets forth the terms under which GMAC would forbear from exercising certain of these rights.  (*Id.* at 2.)  Among other terms, plaintiffs agreed to execute the Voluntary Surrender Agreement, pay all monies owed by December 8, 2008, and allow GMAC representatives to remain on the Walden Fleet premises.  (*Id.* at 2-3.)

---

[2] Dennis Hecker is not a party to this action, but the complaint alleges that he owns the dealerships at issue in this case.  (Compl. ¶ 41, Docket No. 1.)

The Voluntary Surrender Agreement calls for Walden Fleet to surrender "possession of all motor vehicles owned by [Walden Fleet Group] and the other assets pledged as security for the Indebtedness (collectively 'Collateral')."  (Voluntary Surrender Agreement at 1, Compl. Ex. B, Docket No. 1.)  It also grants GMAC the right to "enter all premises of [plaintiffs'']," to "sell, lease or otherwise dispose of the Collateral in any manner permitted by any of the . . . agreements between GMAC and [plaintiffs], or as permitted by applicable law," and to "apply the proceeds of the disposition and sale of the Collateral to the payment of the Indebtedness, and any other sums due or to become due . . . in such order and manner as GMAC determines in its sole discretion, unless otherwise directed by law."  (*Id.*)

The complaint alleges that plaintiffs generally kept on deposit with GMAC at least $300,000 in an unrestricted, interest-bearing cash management account.  (Compl. ¶ 13, Docket No. 1.)  In early 2009, GMAC required plaintiffs to place a total of $600,000 in this account.  (*Id.*)  After plaintiffs did so, GMAC "froze Plaintiffs' use of all of these monies, which had a material adverse impact on the cash flow of the dealerships."  (*Id.*)

The complaint alleges that in late 2008 and early 2009, "GMAC took possession and control of the keys and title documentation to all of Plaintiffs' automobiles [that] GMAC had financed."  (*Id.* ¶ 14.)  GMAC refused to allow the title documentation to be transferred at the time a vehicle was sold "unless all proceeds from the sale, including amounts for taxes, licensing fees and (if applicable) lien payoffs on trade in vehicles were paid directly to GMAC at the time of closing on the sale."  (*Id.*)

According to the complaint, plaintiffs learned that GMAC was not passing along the sale proceeds it received for taxes and license and title fees to the State of Minnesota. (*Id.* ¶ 15.)  Plaintiffs requested an accounting, but GMAC refused to comply with the request.  (*Id.*)  Plaintiffs also requested that GMAC use funds in the cash management account to pay the State of Minnesota, but GMAC refused to do so, (*id.* ¶ 17), although it did release "a token portion of all monies held," (*id.* ¶ 16).  On June 17, 2009, law enforcement officials from the State of Minnesota "executed search warrants on Plaintiffs' properties seeking information on why tax, title and license fees as well as lien payoffs had not been made in conjunction with automobile sales Plaintiffs had made, but on which GMAC received all the proceeds[.]"  (*Id.* ¶ 20.)

On January 8, 2010, plaintiffs filed suit against GMAC.  (Compl., Docket No. 1.)  The complaint alleges seven causes of action: (1) conversion/misappropriation of monies; (2) breach of contract under Minnesota Statute § 297B.10(b) (requiring a person who collects taxes due on the sale of an automobile to remit those amounts to the State of Minnesota); (3) lender control liability; (4) breach of fiduciary duties; (5) constructive trust; (6) unjust enrichment; and (7) a demand for an accounting.

The complaint requests "an order for judgment against Defendant GMAC for all amounts due and owing," and requests in the alternative an order that GMAC "provide monies it wrongfully obtained and continues to retain to pay all amounts that remain due and owing to the State of Minnesota and other third parties for tax, title, license fees, as well as lien payoffs and warranty program."  (*Id.* at 14-15.)  The complaint further requests that the Court issue an order stating that GMAC is "directly liable to the State of

Minnesota and other third parties that should have been paid from the automobile sales transactions it controlled," and directing the establishment of a constructive trust for the amounts owed.  (*Id.*)

GMAC moves to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  In the alternative, GMAC moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## ANALYSIS

### I.    Standard of Review

It is the plaintiff's burden to establish that jurisdiction exists.  *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).  In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.*  If the motion to dismiss under Rule 12(b)(1) is based on a deficiency in the pleadings, however, the "standard of review is the same standard we apply in Rule 12(b)(6) cases."  *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).  If the Court finds that jurisdiction is not present, it must dismiss the matter.  Fed. R. Civ. P. 12(h); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583-84 (1999).

In deciding a 12(b)(6) motion to dismiss for failure to state a claim, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d

185, 187 (8th Cir. 1986).   In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).   To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.   This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556.   In *Ashcroft v. Iqbal*, the United States Supreme Court reiterated that "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' . . .   Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"   129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

## II.     Article III Standing

To establish Article III standing, "the plaintiff must have suffered an injury in fact; there must be a causal connection between that injury and the conduct complained of; and it must be likely that the injury would be redressed by a remedy the court could order." *Stalley*, 509 F.3d at 521 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).   Each of these elements "must be supported in the same way as any other matter

on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

GMAC argues that plaintiffs lack Article III standing because plaintiffs do not allege injury-in-fact as a direct result of GMAC's actions. Injury-in-fact is described as "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal quotation marks omitted). The complaint must allege "that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury[.]'" *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). "The injury or threat of injury must be both real and immediate." *Id.* (internal quotation marks omitted). Standing doctrine also includes a "general prohibition on a litigant's raising another person's legal rights[.]" *Allen v. Wright*, 468 U.S. 737, 751 (1984). This restriction exists to respect "the autonomy of those persons likely to be most directly affected by a judicial order." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). The Court examines each count separately to determine whether plaintiffs have established Article III standing with respect to that claim. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[Standing] often turns on the nature and source of the claim asserted.").

## A.      Conversion/Misappropriation of Monies (Count 1)

Plaintiffs' conversion claim rests on the allegation that GMAC improperly seized the funds in question because those funds "belonged to the State of Minnesota and other

third parties." (Compl. ¶ 28, Docket No. 1.)  The complaint fails to establish, however,

that plaintiffs have standing to bring this claim, because the injury alleged is to the State

of Minnesota and third parties, not to plaintiffs personally.  The fact that GMAC may

have committed a wrongful act (withholding funds from the State of Minnesota and third

parties) is not sufficient to confer standing on a party that has alleged no injury as a result

of that act.  *See Allen*, 468 U.S. at 751 ("[Standing doctrine] has a core constitutional

component that a plaintiff must allege personal injury fairly traceable to the defendant's

allegedly unlawful conduct[.]").[3]

The complaint makes much of the language in the Voluntary Surrender Agreement

that "GMAC will apply the proceeds of the disposition and sale of the Collateral to the

payment of the Indebtedness . . . **unless otherwise directed by law**." (Voluntary

Surrender Agreement at 1, Compl. Ex. B, Docket No. 1 (emphasis added).)  Plaintiffs

allege that this language indicates that GMAC was not authorized to apply the money that

had been "designated and entrusted" for payments to the State of Minnesota and other

third parties against the debt plaintiffs owed to GMAC.  (Compl. ¶ 26, Docket No. 1.)

Even assuming this interpretation is correct, the language does not establish plaintiffs'

---

[3] Plaintiffs make several allegations that could, in theory, constitute personal injury. They allege that GMAC froze plaintiffs' access to certain funds, (Compl. ¶ 13, Docket No. 1), making it impossible for plaintiffs to pay the State of Minnesota and other third parties using these funds, (*id.* at 2).  They also allege that law enforcement officials from the State of Minnesota "executed search warrants on Plaintiffs' properties seeking information on why tax, title and license fees" had not been paid.  (*Id.* ¶ 20.)  However, plaintiffs do not allege that these alleged injuries are fairly traceable to wrongful acts committed by GMAC, nor do they plead sufficient facts to "raise [their] right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see Iqbal*, 129 S. Ct. at 1950-51.

injury-in-fact.  If GMAC wrongfully retained funds that by law were the property of third parties, that claim should be addressed in a proceeding brought by those third parties, not by plaintiffs.

Plaintiffs allege that GMAC is directly liable to the State of Minnesota, unnamed third parties, and to plaintiffs themselves.  (*Id.* ¶¶ 30-31, 38.)  While the Court must accept all factual allegations as true, it is not "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor is "an unadorned, the-defendant-unlawfully-harmed-me accusation" sufficient, *Iqbal*, 129 S. Ct. at 1949.[4]  Plaintiffs must plead with particularity the wrongful act, the injury, and causation between the two in order to establish standing to bring a claim.  Because they have not alleged how GMAC's allegedly unlawful acts of conversion caused a direct and personal injury to themselves, they do not have standing to bring a claim of conversion/misappropriation of funds.

---

[4] Plaintiffs' affidavit includes copies of multiple news articles discussing complaints made by consumers against plaintiffs and plaintiffs' owner.  (Skolnick Aff. Exs. B-J, Docket No. 14.)  Plaintiffs offer this media coverage – not mentioned in the complaint – as support for the conclusion that plaintiffs are being held accountable for funds unpaid to the State of Minnesota and third parties.  (Pls.' Mem. in Opp'n to Defs.' Mots. for Dismissal at 13, Docket No. 12.)  While a court may consider information outside of the pleadings to determine whether Article III standing exists, the fact that media institutions have come to a certain conclusion regarding liability does not assist the plaintiffs' argument that they have standing to enforce GMAC's alleged obligations to the State of Minnesota.  Nor have plaintiffs made any claim of reputational injury such as might link the media statements to any wrongful act by GMAC.

**B.     Violation of Minnesota Statute § 297B.10(b) and Breach of Contract (Count 2)**

Plaintiffs allege that that the Voluntary Surrender Agreement obligates GMAC to turn over funds collected from plaintiffs to the State of Minnesota because the phrase "unless otherwise directed by law" constitutes an "express protection[] for Plaintiffs . . . prohibit[ing] offsetting amounts due to GMAC by Plaintiffs with monies belonging to third parties." (Compl. ¶¶ 34-35, Docket No. 1.) They argue that GMAC's failure to turn over these funds constitutes a violation of Minnesota Statute § 297B.10(b) and a material breach of GMAC's agreements with plaintiffs. (*Id.* ¶¶ 33, 37.)

Even assuming that GMAC has violated both Minnesota Statute § 297B.10(b) and its agreements with plaintiffs, the injury is to the State, not to plaintiffs. In order to have standing to bring a breach of contract claim, plaintiffs must plead sufficient facts to allow the Court to conclude that plaintiffs have a plausible chance of showing that they have been personally injured as a result of the breach. *See Twombly*, 550 U.S. at 555 (holding that plaintiffs' pleading must "raise a right to relief above the speculative level"); *Lujan*, 504 U.S. at 561 (stating that each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"). Plaintiffs cannot allege that the funds involved are the property of third parties and yet insist that they have an injury-in-fact that is fairly traceable to GMAC's retention of those funds.[5]

---

[5] Plaintiffs' response to defendant's motion to dismiss asserts that plaintiffs have a possessory interest in the funds in question. (Pls.' Mem. in Opp'n to Defs.' Mots. for Dismissal at 16-17, Docket. No. 12.) The complaint, however, does not contain allegations to support this legal theory, and it also does not allege that there is an actual or imminent injury to this interest

(Footnote continued on next page.)

If GMAC has in fact wrongfully withheld funds owed to the State of Minnesota pursuant to Minnesota Statute § 297B.10(b), the State may pursue that claim.

### C.      Lender Control Liability (Count 3)

Plaintiffs allege that GMAC "is liable as a creditor in possession for its wrongful conduct in diverting monies for its own benefit that rightfully belong to others," (Compl. ¶ 40, Docket No. 1), but the complaint does not allege how this conduct has led to a concrete, personal injury to plaintiffs.  Plaintiffs allege that their owner, Hecker, is currently under investigation by the State of Minnesota as a result of GMAC's failure to remit tax, title and license fees.  (*Id.* ¶ 41.)  As neither Hecker nor the State of Minnesota is a party to this action, the allegation fails to support standing.  The lender liability claim is merely an alternative theory whereby GMAC would be liable to the State of Minnesota or third parties, and therefore plaintiffs have not alleged facts sufficient to establish Article III standing as to Count 3.

### D.      Breach of Fiduciary Duties (Count 4)

Plaintiffs allege that GMAC "agreed to directly handle any and all monies received in sales transactions, as well as retain control over the finances of Plaintiffs," and that these "unique circumstances" give rise to a fiduciary relationship.  (Compl. ¶ 45, Docket No. 1.)  The existence of a fiduciary relationship is generally a question of fact.

---

(Footnote continued.)

beyond the hypothetical liability of a future action by the State of Minnesota or other third parties.

*Minn. Timber Producers Ass'ns, Inc. v. Am. Mut. Ins. Co. of Boston*, 766 F.2d 1261, 1268 (8th Cir. 1985).  Typically, the relationship between lender and borrower is not a fiduciary one.  *See Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (1973); *see also H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1421 (D. Minn. 1993).  Under certain circumstances, however, it is possible, for a lender-borrower fiduciary relationship to arise.  *H Enters.* 833 F. Supp. at 1421.  If GMAC knew or should have known that plaintiffs were "placing trust and confidence in the lender and relying on the lender to counsel and inform," such facts could establish the special circumstances required to create a fiduciary relationship.  *Id.* at 1422.

Bankruptcy courts have recognized a more specific exception, finding that a fiduciary relationship can exist between a lending institution and a debtor where the lender exerts direct control over the debtor.  *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1015-16 (Bankr. N.D. Ill. 1996).  Taking all reasonable factual allegations in the pleadings as true, a reasonable trier of fact could find that a fiduciary relationship existed between GMAC and plaintiffs, and that GMAC assumed responsibility for plaintiffs' obligations under Minnesota Statute § 297B.10(b).

Even if such a relationship existed, however, plaintiffs have not alleged facts sufficient to show that they have an injury that is actual or imminent and caused by any breach of fiduciary duty.  Plaintiffs have alleged only that they have an ongoing liability regarding the funds due to the State of Minnesota (and other third parties), and that they have been investigated for failure to pay these funds.  (Compl. ¶ 20, Docket No. 1.)  With respect to that liability, plaintiffs offer only conclusory statements that they have

"incurred and continue[] to incur damages in excess of $75,000." (*Id.* ¶ 48). These damages are in the form of payments allegedly due to the State of Minnesota and other third parties. (*Id.* ¶ 43.) Even if the Court were to find that GMAC were liable under a breach of fiduciary duty theory, plaintiffs offer no factual basis to support the conclusion that their injury is something more than hypothetical future liability.[6] Without an actual or imminent injury, plaintiffs do not have standing to bring a claim for breach of fiduciary duty.

### E.       Constructive Trust (Count 5)

Without a showing of injury-in-fact, the Court has no authority under Article III to establish a constructive trust. Although there may be a factual dispute as to the existence of a fiduciary relationship that might justify the creation of such a trust, the injury to plaintiffs is speculative because it is contingent on what course of action the State of Minnesota or other third parties take in the future. Because plaintiffs have not pleaded sufficient facts to shift their claims "across the line from conceivable to plausible," *Iqbal*,

---

[6] Plaintiffs' claims also fail to satisfy the ripeness requirement for Article III standing, as plaintiffs' injury "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted). The ripeness inquiry calls for the Court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *KCCP Trust v. City of N. Kan. City*, 432 F.3d 897, 899 (8th Cir. 2005). Because the State of Minnesota and the third parties mentioned in the complaint are not parties to this action, plaintiffs' claims are not fit for judicial decision at this time. Plaintiffs may wish to head off future claims by those parties through this action, but a court will be better equipped to address the concerns raised in the complaint if or when the State of Minnesota chooses to act on its investigation.

129 S. Ct. at 1951 (internal quotation marks omitted), they do not have standing to bring their constructive trust claim.

### F.     Unjust Enrichment (Count 6)

Plaintiffs allege that "[i]t would be unjust and inequitable to allow GMAC to retain the substantial monies it continues to wrongfully retain when intended third party recipients (parties GMAC knew were entitled to these escrowed monies) remain unpaid." (Compl. ¶ 54, Docket No. 1.)  This claim fails for the same reasons as plaintiffs' other claims.  GMAC may have "preferred itself over the State of Minnesota [and] various third party lenders," (*id.* ¶ 53), but this is a claim for the State and those third parties to pursue, because it is at their expense that GMAC was allegedly unjustly enriched.

### G.     Demand for an Accounting (Count 7)

Finally, because plaintiffs do not allege any concrete injury to themselves, plaintiffs have not established standing to request relief in the form of an accounting of transactions.  The complaint does not contain allegations giving rise to the plausible conclusion that an accounting would address a concrete, immediate injury to plaintiffs that is fairly traceable to GMAC's actions.  Plaintiffs therefore have not established a right to the relief they seek.

In summary, in order to establish Article III standing to bring a claim, a plaintiff must show an injury-in-fact that is personal, concrete, and actual or imminent. *Steel Co.*, 523 U.S. at 103.  Plaintiffs allege injury to the State of Minnesota and to third parties, but have not pled facts sufficient to establish a personal injury-in-fact that is causally

connected to GMAC's wrongdoing.   Accordingly, the Court dismisses their claims without prejudice for lack of jurisdiction.

## ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant's Motion to Dismiss [Docket No. 2] is **GRANTED**.

2.      Plaintiffs' Complaint is **DISMISSED without prejudice**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:   August 26, 2010                             s/ John N. Tunheim
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                     United States District Judge